**AMAX COAL COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. EV 94–79–C.

United States District Court,
S.D. Indiana,
Evansville Division.

Feb. 2, 1996.

G. Daniel Kelley Jr., Mark J. Richards, Edward P. Steegmann, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for AMAX Coal Company.

Jeffrey L. Hunter, United States Attorney's Office, Indianapolis, IN, Deborah S. Meland, Trial Atty. Tax Div., U.S. Dept. of Justice, Washington, DC, for United States.

### MEMORANDUM

BROOKS, District Judge.

This Matter is before the Court on the Plaintiff's Motion for Partial Summary Judgment and Brief in Support of Plaintiff's Motion for Partial Summary Judgment filed September 29, 1995.

This Matter is also before the Court on The United States' Motion for Partial Summary Judgment and Memorandum in Support of The United States' Motion for Partial Summary Judgment filed September 29, 1995.

Amax's Brief in Opposition to Defendant's Motion for Partial Summary Judgment was filed October 20, 1995. The United States' Memorandum in Reply to Plaintiff's Motion for Partial Summary Judgment and in Further Support of Its Motion for Partial Summary Judgment was filed October 20, 1995. Amax's Reply Brief was filed November 13, 1995.

### Statement of Relevant Facts

The Plaintiff AMAX Coal Company ("AMAX") is a Delaware corporation with its principal place of business in Evansville, Indiana. (Complaint ¶ 2; Answer ¶ 2). On April 25, 1994, AMAX brought this action seeking a refund of certain Black Lung Excise Tax ("BLET") payments and interest made to the Defendant United States of America ("United States") from March 1, 1989 through December 31, 1991, including certain BLET payments on coal mined and sold from AMAX's Belle Ayr and Eagle Butte mines. (Plaintiff's Proposed Findings of Undisputed Fact and Conclusions of Law ¶ 3 (hereinafter "Plaintiffs' Facts ¶——"); The United States' Proposed Findings of Undisputed Facts and Proposed Conclusions of Law ¶ 2 (hereinafter "Defendant's Facts ¶ ——")).

For each of the tax quarters at issue, AMAX filed a Quarterly Excise Tax Return (Form 720). (Plaintiffs' Facts ¶ 8; Defendant's Facts ¶ 6; Affidavit of William M. Hartzler ¶ 6). The Internal Revenue Service ("IRS") subsequently audited AMAX for these tax quarters, and determined that AMAX owed additional BLET due to improper percentage exclusions for excess moisture associated with coal mined and sold by AMAX. (Complaint ¶¶ 12, 16; Affidavit of William M. Hartzler ¶ 8). The IRS did not allow for the exclusion of any percentage of excess moisture for coal sold for less than $13.05 per ton. (Complaint ¶ 14; Affidavit of William M. Hartzler ¶ 8). AMAX or coal purchasers have paid the additional BLET and interest which the IRS claimed it was due. (Plaintiffs' Facts ¶ 10; Defendant's Facts ¶ 6; Affidavit of William M. Hartzler ¶ 9). On or about July 6, 1993, AMAX filed claims for refund of the additional BLET paid as a result of the audit for the tax quarters at issue. (Complaint ¶ 20; Defendant's Facts ¶ 6; Affidavit of William M. Hartzler ¶ 9). By letters dated April 11, 1994, the IRS denied AMAX's claims. (Complaint ¶ 20; Defendant's Facts ¶ 6; Affidavit of William M. Hartzler ¶ 9).

During the quarters at issue, AMAX sold coal from the Belle Ayr and Eagle Butte mines ("the mines") pursuant to various contracts. (Plaintiffs' Facts ¶ 12; Defendant's Facts ¶ 8). The coal produced at the mines is primarily classified as subbituminous, (Defendant's Facts ¶ 5; AMAX Response to U.S. Interrogatory Nos. 22, 23), and was sold for less than $13.05 per ton. (Complaint ¶ 14).

Both parties now move for summary judgment with respect to the IRS's disallowance of any percentage reduction for excess moisture on coal sold for less than $13.05 per ton in computing the amount of BLET due.

### Discussion

The Court has jurisdiction in this Matter pursuant to 28 U.S.C. § 1346 as an action brought for the recovery of an internal-revenue tax alleged to have been erroneously or illegally collected.

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Before the movant is entitled to summary judgment he must carry the burden of establishing that there is no existing genuine issue of material fact. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 473 (7th Cir.1988). After the moving party has met this burden, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial* '." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 [emphasis in original]; *see also McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir.1989) ("A party faced with a motion for summary judgment who bears the burden of proof on a particular issue may not rest on its pleadings but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact for trial"). A material question of fact is a question which will be outcome determinative of an issue in that case. *Wainwright Bank v. Railroadmens Federal Savings*, 806 F.2d 146 (7th Cir.1986). Summary judgment is only appropriate, however, whenever the "record taken as a whole could not lead a trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.' " *Id.*

As an initial matter, the Court notes that a question concerning this Court's jurisdiction in this Matter was raised by the government in the "United States' Memorandum in Reply to Plaintiff's Motion for Partial Summary Judgment and in Further Support of Its Motion for Partial Summary Judgment." This issue concerned the requirement that a taxpayer claiming a refund of excise taxes paid under chapter 31 of the Internal Revenue Code file customer consents with the IRS under 26 U.S.C. § 6416(a)(1) if the burden of the tax has been passed on to purchasers of the product. By letter dated December 1, 1995, the Plaintiff represented that the United States was withdrawing this issue from the Courts' consideration at this time, and the United States, by letter dated January 19, 1995, has agreed to withdraw its arguments concerning the Court's jurisdiction to presently consider the merits of the parties' motions.

The United States taxing authority relevant to the present dispute is enumerated at 26 U.S.C. § 4121, which provides in pertinent part:

(a) **Tax imposed.** (1) **In General.** There is hereby imposed on coal from mines located in the United States sold by the producer, a tax equal to the rate per ton determined under subsection (b).

(2) **Limitation on tax.** The amount of the tax imposed by paragraph (1) with respect to a ton of coal shall not exceed the applicable percentage (determined under subsection (b)) of the price at which such ton of coal is sold by the producer.

(b) **Determination of rates and limitation on tax.** For purposes of subsection (a)—

(1) the rate of tax on coal from underground mines shall be $1.10,

(2) the rate of tax on coal from surface mines shall be $.55, and

(3) the applicable percentage shall be 4.4 percent.

26 U.S.C. § 4121.

The limitation provision of subsection (a)(2) mandates that if coal is sold for less than $13.05 per ton, the BLET on the coal is computed as 4.4 percent of the price at which the coal is sold by the producer.

■ As a threshold matter, the Court must determine the meaning of "coal" as used in Section 4121. The United States agrees that the term "coal" does not include excess moisture when the coal is sold for at least $13.05 per ton, and the IRS allows for a "calculated reduction of taxable weight of coal for the weight of excess moisture ... where the taxpayer can demonstrate through competent evidence that there is a reasonable basis for its determination of the existence, and amount, of excess moisture." Rev.Ruling 86–96, 1986–2 C.B. 181.

The IRS's position—as given in Revenue Ruling 86–96—was issued in direct response to the decision of the United States District Court for the Northern District of Alabama

in *A.J. Taft Coal Company v. United States*, 605 F.Supp. 366 (N.D.Ala.1984), *aff'd*, 760 F.2d 280 (11th Cir.1985); *see*, Rev.Ruling 86–96, 1986–2 C.B. 181 ("For purposes of the tax imposed by section 4121 of the Code, the Internal Revenue Service will follow the Taft Coal Co. decision regarding the moisture content of coal"). In *Taft*, the Court held that the plain language of Section 4121 mandates a holding that " 'coal' as used in the statute and the regulation does not include water which is excess to its inherent moisture content and which is reasonably measurable." *Taft*, 605 F.Supp. at 372.

The government contends, however, that *Taft* has no application to a situation where subsection (a)(2) of Section 4121 applies and the BLET is levied based upon the price charged by the producer, rather than on the rate per ton basis.

The mere fact that the BLET levying authority provides for a different standard by which a tax is measured does not, however, change the plain meaning of the statute. Rather, this Court agrees with the reasoning of the *Taft* decision and Revenue Ruling 86–96, and must conclude that the BLET is to be assessed only on "coal;" that is, coal as it occurs in its natural state, including inherent moisture, ash, sulphur, and other noncalorific substances. "Coal" does not include such elements as excess moisture, which is added to the coal after its extraction from its natural state. This meaning does not change if the "coal" is sold for less than $13.05 per ton.

Not only would the application of different meanings for the term "coal" be unprecedented and contrary to all normal rules of statutory construction, but any other holding would also defeat the obvious purpose of Congress' including a percentage limitation on the amount of BLET assessed.

The danger of providing a flat rate per ton tax on coal is that lower-priced coals will be taxed at a higher percentage of the price at which the coal is sold in the marketplace. For instance, if coal is sold at $1.00 per ton, 55 percent of the sale price would be allocated to the BLET if the limitation provision of subsection (a)(2) were absent from the statute. As a result, Congress included the limitation providing that the tax may not exceed

4.4 percent of the price charged by the producer.

If one agrees with the government's present position, a coal producer may actually be penalized for selling coal at a lower price. For instance, assume that a producer extracts 40 tons of coal, and 10 tons of excess moisture are added to the coal. If he sells the coal at $13.10 per ton, he will pay $.55 BLET per ton on 40 tons of coal, resulting in a total BLET liability of $22.00. If, on the other hand, the producer sells the coal for $13.00 per ton (on 40 tons of coal and 10 tons of excess moisture), he will pay 4.4% of $650.00, or $28.60 of BLET. Rather than being a "limitation" on reducing the BLET paid on lower-priced coal, the government's position would have subsection (a)(1) operate as a surtax until the producer charged $10.00 per ton or less for his coal.

To permit the taxation of excess water also would contravene the purpose of placing an excise tax on coal. The BLET is levied to fund the Black Lung Disability Trust Fund established by Congress. 26 U.S.C. §§ 4121, 9501. This fund was established to pay benefits to miners and their survivors affected by pneumoconiosis, commonly referred to a "Black Lung" disease, which is known to be caused by coal production activities. (*See* Memorandum in Support of the United States' Motion for Partial Summary Judgment at p. 6). Because the disease is caused by the production of coal, Congress chose to place an excise tax on coal production to fund the trust. Conversely, water is not known to cause pneumoconiosis, and water was not intended by Congress to be subject to the BLET.

■ This finding that "coal" does not include any excess moisture content within the meaning of the BLET does not end the Court's inquiry, however, as the fact that the BLET on lower-priced coal is levied as a measure of the price at which the coal is sold by the producer—rather than by produced tonnage—raises additional issues. Because the BLET on lower-priced coal is calculated as a percentage of the price charged for the coal by the producer, the Court also must determine whether the government—in disal-

lowing any calculated reduction in this case—is impermissibly taxing excess moisture, rather than coal.

This inquiry necessitates a review of the coal contracts between AMAX and coal purchasers for a determination of whether AMAX was charging purchasers for only "coal," or "coal" plus excess moisture. If the price paid was only for "coal," AMAX would not be entitled to a reduction for excess moisture, as the 4.4 percent BLET could be assessed on this amount without any impermissible taxing of excess moisture. Conversely, if the purchasers were paying for both coal and excess moisture, AMAX would be entitled to deduct the amount paid for the excess moisture before calculating the BLET tax due.

On this point, AMAX argues that its contracts with purchasers established a price per ton of delivered product, including calculated excess moisture, with no decrease in price for the inclusion of excess moisture with the coal. As a result, AMAX argues that the BLET liability should be decreased according to the weight of the excess water included with the shipped coal to avoid the taxation of the excess moisture.

Conversely, the government argues that some of AMAX's contracts with purchasers were "Btu contracts," in which the purchasers paid only for the amount of Btus generated by the coal, and the remaining contracts were "deadband contracts," which provided for adjustments for variances in the Btu content of the delivered coal. As a result, the government argues that purchasers were paying only for "coal," less any excess moisture, and the 4.4 percent BLET should be computed on the price charged by AMAX f.o.b. mine, without any deduction for excess moisture.

After a thorough review of the relevant contractual provisions submitted as exhibits for the present motions, it is clear that AMAX's purchasers paid for coal from the mines on a "per ton" basis as a general rule. As the government argues, however, this "per ton" basis generally was adjustable for fluctuations in the Btu value of the delivered product. It is undisputed that moisture—whether inherent or excess—negatively af-

fects the calorific value of coal. Likewise, it is undisputed that the coal extracted from the Belle Ayr and Eagle Butte mines by AMAX and delivered to its purchasers contained some quantity of excess moisture. As a result, at first glance the government's position appears to have merit.

Even if the excess moisture in coal from the mines could theoretically reduce the price paid for the coal, however, the undisputed evidence shows that the expected content of both the inherent and excess moisture in the coal was already taken into account in establishing the base price per ton of the coal. (Affidavit of George W. Land ¶¶ 5–8; Affidavit of J. Mark Cook executed September 27, 1995 at ¶ 4; Affidavit of J. Mark Cook executed July 28, 1994 at ¶ 5). As a result, excess moisture had no impact on any Btu fluctuations in the delivered product.

When one considers the fact that excess moisture did not result in Btu differences, but was already employed in the computation of the base price per ton charged, however, the Court's inquiry must take a different turn. If, as AMAX argues, the base price per ton assumes a certain content of excess moisture, the price charged to purchasers as a base price might actually have been deflated due to this moisture content. In other words, to find that AMAX is now entitled to deduct excess moisture in computing the BLET may result in a double-dipping effect for AMAX: The base price charged to purchasers already may have been negatively impacted by the inclusion of excess moisture in computing the per ton base price, thus reducing AMAX's BLET liability at the time the coal was sold. If such is true, AMAX would not be entitled to further reduction in its BLET liability. On the other hand, if coal purchasers did not pay a lower price due to the inclusion of certain tolerances for excess moisture in their contracts, AMAX may be entitled to a deduction for the amount of excess moisture added to the coal.

Unfortunately, although AMAX argues that excess moisture is included in computing the base price per ton, neither party recognized the potential impact that this assertion may have on AMAX's BLET liability. After

reviewing the coal supply contracts and other factual support submitted by the parties, the Court cannot make a determination regarding these issues. As a result, there remain genuine issues of material fact regarding whether AMAX and coal purchasers considered excess moisture content when negotiating and agreeing on a base price per ton for the coal.

After considering the foregoing, as well as the relevant case and statutory law, the Court hereby **DENIES** the **Plaintiff's Motion for Partial Summary Judgment** and **DENIES The United States' Motion for Partial Summary Judgment.**

**IT IS SO ORDERED.**