**A.J. TAFT COAL COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. CV82–PT–2145–J.**

United States District Court, N.D. Alabama, Jasper Division.

June 14, 1984.

On Application for Attorney Fees, Aug. 22, 1984.

---

Charles A. Powell, III, Stephen A. Rowe, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for plaintiff.

Frank W. Donaldson, Sharon Lovelace, Caryl P. Privett, Asst. U.S. Attys., Birmingham, Ala., Karl L. Kellar, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

Fournier J. Gale, III, Roy J. Crawford, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., amici curiae for Alabama By-Products Corp., Drummond Coal Co., McWane Coal Co. and Mulga Coal Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PROPST, District Judge.

### UNDERLYING FACTS

During the years in question, April 1, 1978 through June 30, 1980, A.J. Taft Coal Company (Taft) was engaged in the business of surface mining coal in Walker County, Alabama (RT. 22). Taft's only customer was Alabama Power Company, which also owned the mineral rights to the land mined by Taft (Plaintiff's Exhibit [hereinafter "P.Ex."] 3; RT. 22, 25).

. Taft sold coal on a washed and on an unwashed basis during the audit period (RT. 22). Coal to be sold on a washed basis was hauled by Taft trucks to the Bankhead washer where the trucks were weighed, loaded and unloaded, to determine tons of raw, unwashed coal (RT. 22). The Bankhead washer was neither owned nor operated by Taft, but rather was an independent facility (RT. 23). Alabama Power Company paid approximately $2.00 per ton to have Taft's coal washed (RT. 124). After the coal reached the washer, a float-sink test was performed on the Taft coal to determine the ratio of coal to refuse (RT. 24). Using this ratio, Alabama Power Company estimated the tons of coal that would remain after washing, for which it paid Taft (RT. 128). Taft was paid nothing for the refuse separated from the coal in the washing process and the Internal Revenue Service (hereinafter "I.R.S.") does not here seek to tax the refuse (RT. 50, 54).

Taft was paid based on the BTU content of the washed coal (RT. 82). The amount of BTU's per ton of coal is a measure of the quality of said coal; coal having a higher number of BTU's per ton is of better quality than coal with a lower number of BTU's per ton. (Transcript, 83; 122–23). The quality of coal, and its ability to release BTU's, is determined by the purity of said coal; the greater the amount of impurities in the coal, the fewer BTU's will be produced per ton of coal. (Transcript 122–123; 138–139; 141–143). Sulfur, ash, dirt, rocks, and refuse are all considered to be impurities which reduce the quality of coal. Water has no BTU content. (Transcript 122–123; 224–225; 226; 292–294; 56; 60). In paying its Black Lung Tax, Taft reported to the I.R.S. based on the calculated dry

tons of coal which it sold to Alabama Power Company (RT. 50). Raymond Clemmons, the I.R.S. agent who audited Taft's records, adjusted the tonnage reported by Taft for washed coal sold by increasing the tonnage by six percent (RT. 13, 51). Clemmons arrived at the six percent figure by estimation (RT. 13, 78).[1] The six percent gross up of the weight of washed coal resulted in the addition of 1325.68 tons to the 22,094.68 tons of coal already reported (RT. 308–311; P.Ex. 21). The addition of these tons caused an additional tax of $331.43 to be assessed against Taft (RT. 308; P.Ex. 21).

Coal sold on an unwashed basis was delivered to the Gorgas Steam Plant or the Segco Mine where it was weighed and sampled by Alabama Power Company (RT. 53, 55). Taft was paid for this coal on the basis of the BTU value of the coal determined by Alabama Power Company, the purchaser (RT. 55). The unwashed coal was not processed by Taft before delivery and was sampled and analyzed in its raw, as-received state (RT. 56). The contract under which the coal in question was sold provides, in reference to the unwashed coal, that

> ... Trucks delivering coal hereunder shall be weighed both loaded and empty, and the difference in weight shall be the governing weight hereunder.... The aggregate weights determined during any payment period *shall be accepted as the quantity of coal sold and purchased during such period for which invoices are to be rendered and payments to be made....* (emphasis supplied).

The as-delivered weight of coal, as opposed to the dry weight, was used in determining the price paid Taft for unwashed coal (RT. 145). Taft paid its Black Lung Tax by eliminating, by mathematical calculation, all moisture in excess of 2.88%, which it estimated to be the inherent or bed moisture of the coal it mined (RT. 64). For purposes of the Federal excise tax, Taft

originally reported gross tons of coal sold, without any adjustment for moisture. Only after learning that the State of Alabama had decided to allow for severance tax purposes a "moisture adjustment" for all moisture in excess of 2.88 percent, did Taft attempt to claim an equivalent adjustment for federal tax purposes. (Transcript, 91). Agent Clemmons added back the 2.88% which Taft eliminated and recalculated the tax due (RT. 66). This adjustment resulted in the addition of 3,557.83 tons to the tons of coal previously reported by Taft and in the imposition of an additional tax due of $889.46 (P.Ex. 21).

The total tax adjustment resulting from Agent Clemmons' changes was $1,220.89 (RT. 310). The difference between the Excise Tax Examination changes and the $1,400.80 additional excise tax levied against Taft is a result of the addition of interest.

Both the washed and unwashed coal in question was mined in the Warrior Basin coal field from the Pratt, America, Nickel Plate and Cob seams. Harry Raykes, Principal Mining Engineer for Southern Company Services, testifying as an expert witness, testified that these seams have been mined since the beginning of mining in Alabama (RT. 263). The seams cover an extensive area and have reasonably consistent bed moisture (RT. 264).[2] Based on Mr. Raykes' experience in the Warrior Basin coal field, it was Mr. Raykes' testimony that bed moisture in the seams in question would vary from 1.75% to 2.75% with an average moisture of 2.25% (RT. 249, 264–265). Mr. Raykes also testified that he performed a study for Alabama Power Company of the reserves later mined by Taft (RT. 265). Based on this study, it was Mr. Raykes' opinion that the coal mined by Taft and involved in the audit in question had an average bed or inherent moisture of 2.25% (RT. 265).

---

**1.** The six per cent figure is not at issue *per se.* The plaintiff disputes that any percentage should be added.

**2.** There was no evidence that this characteristic likely changed between 1980 and 1982.

Jack Davis of Tuscaloosa Testing testified that he analyzed core samples from the Taft mine in question for total moisture (RT. 195). Mr. Davis utilized test procedures prescribed by ASTM, which is a reasonable standard accepted in the coal industry (RT. 192–193, 279). The analysis of 123 samples resulted in an average total moisture of 2.30% (RT. 199; P.Ex. 20).

The samples taken by Mr. Davis were obtained from the same seams from which the coal in question was mined. However, the samples were taken from different sections of the mine, since the coal in question had already been mined and sold at the time the samples were taken (RT. 175, 181–185). Harry Raykes testified that the prior mining would not affect the average bed moisture of the unmined coal remaining in the area (RT. 272). Likewise, Mr. Raykes testified that the analysis on the remaining coal seams, performed by Jack Davis and Tuscaloosa Testing, would yield a reliable measure of the bed or inherent moisture of the coal involved in this case (RT. 271–272).

Coal lying in an undisturbed state contains inherent or bed moisture (P.Ex. 4, para. 2). The testimony of expert witnesses Raykes and Davis was to the effect that the Pratt, America, Nickel Plate, and Cobb seams are consistent in general with regard to bed moisture and could be expected to have an average bed moisture of 2.25% (RT. 200, 264). Test results performed by Tuscaloosa Testing of the specific coal seam in question showed an average total moisture of 2.30%. Bed moisture or inherent moisture is a component of total moisture (RT. 256, 302). Reynold Shotts testified that Alabama coals contain, on the average, 2.88% inherent or bed moisture (P.Ex. 4). Taft utilized this average when calculating its Black Lung Tax (RT. 66). Taft reported washed coal based on a removal of all moisture including bed moisture.[3]

Harry Raykes and Dan Thornburgh testified that it is the custom and practice in the utility industry, both in Alabama and elsewhere, for coal purchases to be made on the basis of the BTU value of the coal (RT. 110, 282–284). Water has no BTU value (RT. 284). Accordingly, although it is always expected to be present in some quantity with coal delivered, a producer operating pursuant to a BTU contract does not profit financially by shipping water with coal (RT. 120–121, 127, 285). Water added to coal increases the apparent tonnage, but decreases the number of BTU's per ton (RT. 127, 285). Moreover, according to all definitions of coal before the court, water in excess of bed moisture or inherent moisture is not a part of the coal (RT. 281, 306; P.Ex. 4; Shotts' Stipulation).

The coal tonnages reported to the I.R.S. by Taft for Black Lung Tax purposes were determined by Alabama Power Company upon its receipt of the coal (RT. 59, 63–65). This is true whether the coal was sold on a washed or unwashed basis (RT. 111). Alabama Power Company samples each lot of coal received and performs an analysis of the sample (RT. 111, 114).[4] The results of the analysis performed on the coal in question are before the court in Plaintiff's Exhibits 6, 7, and 13.

### CONCLUSIONS OF LAW [5]

The section of the Internal Revenue Code here involved is § 4121 (I.R.C. § 4121) which reads:

(a) Tax imposed—There is hereby imposed on coal sold by the producer a tax at the rates of—

(1) 50 cents per ton in the case of coal from underground mines located in the United States, and

(2) 25 cents per ton in the case of coal from surface mines located in the United States.

---

**3.** Taft acknowledges that it was inconsistent for it to calculate Black Lung Tax for washed coal on a totally dry basis while calculating the same tax for unwashed coal on a dry coal plus inherent moisture basis.

**4.** Washed coal was analyzed in a commingled status with coal produced by others.

**5.** The conclusions of law will be commingled with some ultimate findings of fact.

(b) Limitation on tax—The amount of the tax imposed by subsection (a) with respect to a ton of coal shall not exceed 2 percent of the price at which such ton of coal is sold by the producer.

(c) Tax not to apply to lignite—The tax imposed by subsection (a) shall not apply in the case of lignite.

(d) Definitions—For purposes of this subchapter—

(1) Coal from surface mines—Coal shall be treated as produced from a surface mine if all of the geological matter above the coal being mined is removed before the coal is extracted from the earth. Coal extracted by auger shall be treated as coal from a surface mine.

(2) Coal from underground mines—Coal shall be treated as produced from an underground mine if it is not produced from a surface mine.

(3) United States—The term "United States" has the meaning given to it by paragraph (1) of section 638.

(4) Ton—The term "ton" means 2,000 pounds.

(e) Temporary increase in amount of tax—

(1) In general—Effective with respect to sales after December 31, 1981, and before the temporary increase termination date—

(A) subsection (a) shall be applied—

(i) by substituting "$1" for "50 cents", and

(ii) by substituting "50 cents" for "25 cents", and

(B) subsection (b) shall be applied by substituting "4 percent" for "2 percent".

(2) Temporary increase termination date—For purposes of paragraph (1), the temporary increase termination date is the earlier of—

(A) January 1, 1996, or

(B) the first January 1 after 1981 as of which there is—

(i) no balance of repayable advances made to the Black Lung Disability Trust Fund, and

(ii) no unpaid interest on such advances.

Pursuant to I.R.C. § 4121, the Secretary of the Treasury has issued a Treasury Regulation which states:

*Tonnage sold and sales price.* For purposes of determining both the amount of coal sold by a producer and the sales price of the coal, the point of sale is f.o.b. mine, or f.o.b. cleaning point if the producer cleans the coal before selling it. This is true even if the producer sells the coal on the basis of a delivered price. Accordingly, f.o.b. mine or cleaning point is the point at which the number of tons sold is to be the applicable tonnage rate, and the point at which the sales price is to be determined for purposes of the tax under the 2 percent rate.

Treas.Reg. § 48.4121–1(d)(4).

This court has previously indicated that "[t]here is a certain implausibility to defendant's interpretation of the Regulation...." *See* Memorandum Opinion filed May 18, 1983. The court, however, considered it appropriate to await a trial to "[e]stablish an adequate basis upon which to resolve a difficult question of statutory construction." *Bingham, Ltd. v. United States,* 724 F.2d 921 (11th Cir.1984).

The court has heretofore had two primary concerns with regard to the interpretation of the statute and the regulation.

(1) Is it reasonable to broadly apply the term "coal" to include water which is not inherently a part of the mineral in its unmined state in the absence of a clear intention expressed in the statute or the regulation?

(2) Was there a reasonable basis *in this case* on which to determine the weight of the coal *sans* non-inherent moisture or water (excess water)?

The defendant elected to present no evidence at the trial, apparently relying on either the court finding plaintiff's evidence to be so tenuous as to not meet its burden or, in any event, to merely clearly establish the appropriateness of the defendant's application of the statute and regulation.

The court did not find plaintiff's evidence to be tenuous with regard to the two primary concerns expressed above, and concludes that the plaintiff at least established an unrebutted prima facie case that there was a reasonable basis *in this case* on which to determine the weight of the coal without including the weight of the excess water.

The court certainly does not fault the defendant for relying on the facts as developed during plaintiff's case in chief in asserting its primary position that: "The coal sold by the producer in this case is the gross tonnage delivered by Taft, not the net amount after any claimed moisture *deduction*. There is no language in the relevant statute or regulation which even suggests that such moisture *deduction* can be taken." (emphasis added). *See* Defendant's Post-Trial Brief at 6.[6] For reasons which will be hereinafter discussed, the court cannot agree with its secondary argument that "[p]laintiff failed completely to establish that the claimed adjustments actually represented 'excess moisture.' " *Id.* at 6.

The court's initial factual concern was whether the 2.88% moisture calculation had a reasonable factual basis.[7] The evidence in support of this position was credible and not rebutted. Defendant did not take the position at the trial that the 2.88% figure is incorrect; only that *all* water weight should be included. (R.T. 176–177). Defendant *has* now argued that the figure should not be accepted because it is only an "approximation." The court finds that it is a reasonable percentage and is high for the coal which was being sold. To the extent that it is high, the defendant is advantaged. The court ultimately finds and concludes that plaintiff has satisfied the court by a preponderance of the evidence *in this case* that the "coal" here at issue had an inherent moisture content of 2.88% or less.[8] The court has not based this finding on the acceptance of the 2.88% figure by the State of Alabama. The court's acceptance of 2.88% is based on the undisputed evidence *in this case*. The evidence *was* consistent with Alabama's policy in severance tax collection.

Neither plaintiff nor defendant has cited to the court any cases which are directly apposite. The defendant has argued that the case of *Drummond Coal Company v. Watt*, CV82–H–1838–S (N.D.Ala.1983) supports its position. *Drummond*, however, was a case in which Judge Hancock was asked to declare invalid revised regulations promulgated by the Secretary of the Department of the Interior. These regulations governed a reclamation fee imposed by statute on coal produced in the United States. The regulations, as revised, clearly provided that "Impurities, including water, that have not been removed prior to the time of initial bona fide sale, transfer of ownership, or use by the operator, shall not be deducted from gross weight." The question in *Drummond* was whether the regulation was arbitrary, capricious and inconsistent with the law.[9] There is no clear intent in § 48–4121–1(d)(4), as there was in the *Drummond* regulation, to tax water or any other "impurities."

In the instant case, there is no such clearly defined regulation. The court is

---

**6.** The parties acknowledged during the course of the hearings on the motion for summary judgment that the facts were relatively undisputed. Although it may be a matter of semantics, the court does not necessarily view plaintiff's reliance on Alabama Power Company's moisture calculations as taking a *deduction*. It may be better described as a method by which the amount of *coal* was determined.

**7.** Inherent moisture has also been referred to as "bed moisture" and "equilibrium moisture." It is that moisture which naturally occurs in coal in its unmined state. Moisture which is not inherent is "free moisture," and would include surface water. "Equilibrium moisture" was defined by one witness as "The maximum amount of moisture that the coal itself can hold." Inherent moisture is tested by an equilibrium test.

**8.** This finding is supported by the opinion of Professor Shotts attached to the stipulation.

**9.** The court assumes that the regulation involved in *Drummond* was adopted only after the Secretary met the usual requirements of the Administrative Procedures Act. This assumption is not necessary to the court's decision.

called upon to interpret a statute and a regulation which make reference only to "coal." Whether the court does or does not agree with the decision in *Drummond* is immaterial. It is not applicable here.

Plaintiff has cited *Harrison Combs, et al. v. Sun-Up Coal Company, Inc.*, CV80–P–0126–J (N.D.Ala.1980) as being supportive of its position. In *Sun-Up,* Judge Pointer construed an agreement which required the defendant to make benefit payments to a union benefit plan and trust based on the number of tons of coal sold. Judge Pointer allowed the employer to exclude moisture from the tonnage amounts, saying that when adequate proof is made, a reduction, based upon loss resulting during the washing process and reduction for moisture content", was proper. Although *Sun-Up* involved the construction of a private agreement, it did involve the construction of similar language as that here under consideration.

■ Both plaintiff and defendant make the usual contradictory arguments concerning Congress's intent. The court will not attempt to bolster its own conclusions with sophistical arguments about legislative intent.[10] The court has based its ultimate conclusion on what appears to be the plain language of the statute and the regulation. *See Hanover Bank v. Commissioner of Internal Revenue,* 369 U.S. 672, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962). In the absence of clear Congressional intent and in the further absence of clear regulatory language, the court concludes that "coal" as used in the statute and the regulation does not include water which is excess to its inherent moisture content and which is reasonably measurable.

Defendant has argued: "Similarly, plaintiff not only failed to show the inherent moisture contained in the actual coal in dispute; it failed in the case of washed coal to show what the actual level of 'excess moisture' was. In the case of washed coal, coal from various producers was commingled after washing, with the result that there was no way to distinguish Taft's coal from other coals. (Transcript 26; 35; 41–42; 80; 94–95; 103–104; 131–132; 133; 135). Therefore, the plaintiff cannot even show that the moisture content determined by Alabama Power's analysis actually applied to Taft's coal. Rather those tests merely resulted in an approximation or average. (Transcript 97; 100–101; 146–147; 148)."

■ The court finds and concludes that the amount of excess moisture was independently determined by Alabama Power Company in a commercially reasonable fashion. There was no evidence that the method used was irrational or that there is a more reasonable alternative method to determine the total moisture content. The court has not based its decision merely on the fact that water does not increase the coal's BTU content. The decision is based on a determination that "coal," by definition, does not include excess water. No expert testified that the term "coal" includes water in excess of its inherent moisture content.

The court ultimately finds and concludes that:

(1) Neither the statute nor the regulation can be reasonably interpreted to require the inclusion of water which is excess to inherent moisture content as being "coal," when the weight of the excess water can be reasonably ascertained and there is no clear statutory or regulatory language to the contrary;[11] and

(2) *In this case* there was a reasonable basis for determining the weight of the excess water.

The court will enter a judgment in favor of the plaintiff and against the defendant. Said judgment will allow for the recovery of any amounts paid as a result of includ-

---

**10.** The court does not detect any clear intent in the cited history. It is apparent that Congress was concerned with coal that can contribute to black lung disease and classified it accordingly.

**11.** There was no evidence, by expert opinion or otherwise, presented by defendant which would justify the *necessity* of a contrary interpretation.

ing in the tonnage measurements, of both washed and unwashed coal, moisture in excess of 2.88%. There was perhaps some confusion as to how the plaintiff and/or the defendant made moisture calculations for the "washed" and "unwashed" coal. The proposed judgment should be consistent in including as a part of the "coal," the 2.88%. Within one week after the filing of the Findings of Fact and Conclusions of Law, plaintiff will submit a proposed judgment. Defendant will have one week to file objections as to form.

### ON APPLICATION FOR ATTORNEY FEES

■ This cause comes on to be heard on plaintiff's application for attorney fees under the provisions of 28 U.S.C. § 2412. This section provides for the award of attorney fees against the United States in any civil action brought by *or against* the United States *unless* the trial court finds that the position of the United States was "substantially justified" or that "special circumstances make an award unjust." "The burden of proving that a fee award should not be made rests with the government." *Enerhaul, Inc. v. N.L.R.B.*, 710 F.2d 748–750 (11th Cir.1983). "The test of whether the Government position is sustantially justified is essentially one of reasonableness." *Enerhaul, supra*, 710 F.2d at 750.[1]

The court notes that the facts of this case are substantially different from those in *Enerhaul*. In *Enerhaul*, the court held that the N.L.R.B.'s position in that case was unreasonable under the law of the Eleventh Circuit because of prior Fifth Circuit decisions. In this case, plaintiff never cited a case to this court which was clearly contrary to the position of the Government. On the other hand, the Government consistently maintained its position and ultimately

relied upon a decision by another judge of this court. This court determined that the case of *Drummond Coal Company v. Watt*, No. CV82–H–1838–S (N.D.Ala.1983) was not decisive of this case. It does, however, contain language which would indicate that the Government was substantially justified in its position in this case. The *Drummond* court stated:

Congress chose to tax tonnage of "coal." Obviously there are impurities mixed with coal—dirt, sulfur, water, etc. Congress made no attempt to remove from taxation this small percentage of impurities found in the mined coal. Had Congress been concerned that the inclusion of impurities would work an undue hardship on the coal operators, the tax could have been calculated in other ways. For example, Congress could have taxed the coal on its BTU content. Since Congress refused to distinguish coal from its impurities, the regulation requiring the inclusion of impurities in calculating gross weight at the time of initial sale, transfer, or use, is within the scope of the agency's authority. The fact that the impurities involved here are "added" to the coal after it is mined does not change the result. Again, Congress was well aware that after mining and before sale or use, coal is exposed to water from a variety of sources.

In this case, the ultimate result was to effectively tax the coal based on its BTU content. The language in *Drummond* would indicate that the Government was substantially justified in perceiving the intent of Congress with regard to § 4121.[2]

The Government's ultimate reliance on *Drummond* and its initial reliance on the rationale adopted in the *Drummond* case causes its position to pass the essential test of reasonableness.[3] The Government also

---

1. *Enerhaul* interpreted 5 U.S.C. § 504(a)(1) which uses similar language as found in 28 U.S.C. § 2412.

2. *Drummond* was reversed in *Drummond Coal Co. v. Watt*, 735 F.2d 469 (1984) on jurisdictional grounds.

3. There is a certain irony in plaintiff's argument that it spent over 400 hours in refuting a position that was not substantially justified. This was in addition to time spent by a party which filed an *amicus curiae* brief to oppose the Government's position.

relied upon Revenue Rulings which were not binding on this court.

The Government did not rely on a legal theory which "has been clearly and repeatedly rejected by this court." While this court denied the Government's motion for summary judgment and indicated that there might be some question as to the merit of the Government's position, it also denied a request in briefs by the plaintiff for summary judgment. The court ultimately finds and concludes that there was a reasonable basis in fact and in law for the Government's position and that it was substantially justified. The application will be DENIED.