**AMAX COAL COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. EV 94–79–C R/H.**

United States District Court,
S.D. Indiana,
Evansville Division.

---

13. U.S. Const. art. VI.

G. Daniel Kelley, Jr., Mark J. Richards, Edward P. Steegmann, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Amax Coal Co.

Jeffrey L. Hunter, U.S. Attorney's Office, Indianapolis, IN, Deborah S. Meland, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for United States of America.

## MEMORANDUM OPINION

BROOKS, District Judge.

The Court, having heard all the evidence and arguments of the parties, now enters its findings of fact and conclusions of law consistent with Federal Rule of Civil Procedure 52(a). Any conclusion of law mischaracterized as fact shall be hereby deemed a statement of fact and conversely any statement of fact improperly labeled a conclusion of law shall be deemed a statement of fact.

### Findings of Fact

This case concerns the assessment of Black Lung Excise Taxes ("BLET"). Federal legislation of coal mining commenced shortly after, and arguably in response to, a tragic mine explosion of Consolidation Coal Company's No. 9 Mine in Farmington, West Virginia on November 20, 1968.[1] Although not included in the original version, provisions providing for black lung benefits were quickly added as temporary language and then made a part of the Federal Coal Mine Health And Safety Act of 1969 at Title IV. *See* 30 U.S.C. §§ 901 *et seq.* In 1972 Congress liberalized the eligibility criteria and extended the scope of coverage by passing the Black Lung Benefits Act of 1972. After injured persons continued to fall through the cracks of eligibility, The Black Lung Benefits Reform Act of 1977, Pub.L.No. 95–239, § 7, 92 Stat. 95 (1978), was passed generally entitling miners and their survivors to benefits if the miner became disabled due to pneumoconiosis after being employed for thirty years (twenty-five years for anthracite) or more in an underground mine, or under conditions substantially similar to an underground mine. The federal black lung tax was first imposed by the Black Lung Benefits Revenue Act of 1977, Pub.L.No. 95–227, § 2(a), 92 Stat. 11 (1978) (codified as amended 26 U.S.C.

---

1. *See* Prunty and Solomons, *The Federal Black Lung Program: Its Evolution And Current Issues,* 91 W.Va.L.Rev. 665 (1989); Lopatto, *The Federal Black Lung Program: A 1983 Primer,* 85 W.Va. L.Rev. 677 (1983).

§ 4121). Funds generated by the excise tax on coal were to be dedicated to fund the Black Lung Disability Trust Fund to defray the costs to the public of providing care and financial support to affected covered persons.[2]

BLET is assessed by tonnage of coal sold by the producer.[3] In its natural state coal contains inherent moisture-meaning water is an element of its chemical composition and structural integrity. Without the water the compound becomes something besides coal (most likely dust as the Court understands it). (Official Reporter's Transcript of Court Trial Held on November 18, 1996, at 107, hereinafter "Tr. at —— ".) When removed from its natural state, i.e., mined, coal acquires additional moisture, known alternately and interchangeably as excess moisture, free moisture, added moisture, or surface moisture. Excess moisture is generally accepted to be the moisture in excess of the inherent moisture. Excess moisture is introduced to coal through two primary means: "washing" and natural condensation. "Washing" is a means to separate coal from sulphur and ash—the mined coal is immersed in a liquid with a predetermined specific gravity that facilitates the segregation of coal from the unwanted materials. (Tr. at 108.) Condensation occurs on the surface of mined coal because in its natural state coal will regularly differ in temperature from that of the environment to which it is exposed when mined.

Excess moisture, whether from washing or condensation, clings to the surface area of mined coal. A coal seam can be miles in length, but coal pieces are removed from the ground in chunks. Handling will break the coal pieces down further and what is not inadvertently broken down will be intentionally crushed prior to delivery.[4] Because coal is continually broken into smaller pieces during the mining process, the amount of clinging moisture will increase during the mining process at the same exponential rate as the increase in surface area. (Tr. at 55–56; 104–06.) The added moisture all contributes to the overall weight of the product when delivered to the customer.

As noted above, see Note 3, supra, BLET is assessed by ton of coal sold. The original version of § 4121 imposed taxes at a rate of fifty cents per ton on underground mined coal and twenty-five cents per ton on coal from surface or strip mines—limited to two percent of the sales price so as to not disproportionately tax and thereby punish producers of lower priced coal. See H.R. No. 95–438, 95th Cong.2d Sess. 1 (1978), reprinted 1978 U.S.C.C.A.N. 72, 73 (explanatory statement of Russell B. Long, Chairman of the Senate Committee on Finance). However, while the rate of taxation has progressively increased, at no time has § 4121 explicitly provided for a deduction of the inevitable excess moisture content[5]. Seeing this inequity, a federal court opinion defined the term

2. See Davis v. United States, 972 F.2d 869, 869 (7th Cir.1992); Bonessa v. United States Steel Corp., 884 F.2d 726, 727 (3rd Cir.1989); Note 1, supra.

3. The applicable code language, 26 U.S.C. § 4121, provides:

  (a) **Tax imposed. (1) In General.** There is hereby imposed on coal from mines located in the United States sold by the producer, a tax equal to the rate per ton determined under subsection (b).
  (2) **Limitation on tax.** The amount of the tax imposed by paragraph (1) with respect to a ton of coal shall not exceed the applicable percentage (determined under subsection (b)) of the price at which such ton of coal is sold by the producer.
  (b) **Determination of rates and limitation on tax.** For purposes of subsection (a)—

  (1) the rate of tax on coal from underground mines shall be $1.10,
  (2) the rate of tax on coal from surface mines shall be $.55, and
  (3) the applicable percentage shall be 4.4 percent.
26 U.S.C. § 4121.

4. Coal contracts regularly require that the delivered product not exceed two inches in size. (See, e.g., Exhibit 7, Exhibit 9–1, Exhibit 15–1, Exhibit 21) The utility will then pulverize the coal to a powder 1/200th of an inch in size. (Tr. at 106.)

5. Section 4121 does not detine the term "coal" as applicable thereunder. See Holmes Limestone Company v. United States, 946 F.Supp. 1310, 1318–19 (N.D.Ohio 1996); Costain Coal, Inc. v. United States, 36 Fed. Cl. 38, 40 (1996); A.J. Taft Coal Co. v. United States, 605 F.Supp. 366 (N.D.Ala.1984), aff'd without op., 760 F.2d 280 (11th Cir.1985).

"coal" within § 4121 to exclude water which is in excess of its inherent moisture. *A.J Taft Coal Co. v. United States*, 605 F.Supp. 366 (N.D.Ala.1984), *aff'd without op.*, 760 F.2d 280 (11th Cir.1985). Shortly after *Taft* was affirmed, the I.R.S. followed the federal district court's reasoning *in toto* with the notation that "[t]he Service will allow a calculated reduction of taxable weight for the weight of excess moisture, but only where the taxpayer can demonstrate through competent evidence that there is a reasonable basis for its determination of the existence, and amount, of excess moisture." Rev.Rul. 86–96, 1986–2 C.B. 181 (1986).

Plaintiff Amax Coal Company ("Amax") is a Delaware corporation engaged in the business of mining and selling coal. (Complaint ¶ 2; Answer ¶ 2.) During 1989 through 1991, Amax mined and sold coal from its Chinook, Minnehaha, Ayrshire, Delta, and Wabash mines in the Midwest (collectively hereinafter the "Midwestern Mines"), and from the Belle Ayr and Eagle Butte mines in the west (hereinafter the "Powder River Mines"). (Amended/Supplemental Complaint, paragraph 3, "Compl., ¶ — ".) Amax timely filed Form 720 Quarterly Excise Tax Returns for each of the taxable periods beginning January 1, 1989 and ending December 31, 1991 ("Quarters In Issue") with the United States and made timely BLET payments for each of the Quarters In Issue. (Stipulation Of The Parties at paragraphs 4 and 7, hereinafter "Stipulation, ¶ —"; Compl., ¶ 4.)

The IRS audited Amax for the Quarters In Issue ("Audit") and caused new samples to be taken in 1992. (Compl., ¶ 10.) The Audit results generally claimed that Amax overstated the amount of excess moisture deduction available for the Quarters in Issue. The IRS claimed: (1) Amax improperly deducted excess moisture from BLET calculations for the Powder River Mines and a small portion of the coal from the Wabash Mine because the § 4121(a)(2) limitation was applicable; and (2) Amax's excess moisture testing generally stated an inflated number for the Midwestern Mines. (Stipulation, ¶ 6–7.) The

IRS issued an assessment in the amount of $1,343,192 plus interest. (Compl., 14.) Amax paid the assessment and filed claims for a refund which were denied by the IRS leading, in turn, to this litigation. (Stipulation, ¶ ¶ 8–9.) The parties filed cross motions for partial summary judgment: the United States claiming that moisture deductions are inapplicable where surface mined coal sells for less than $12.50 per ton, and Amax claiming that moisture deductions are applicable to BLET calculations regardless of the sale price of the coal. The Court readily concluded that § 4121 intended to tax the sale of "coal" alone and not excess moisture, but partial summary judgment was denied nonetheless because of factual issues pertaining to Amax's coal contracts. (Memorandum Opinion at 9–12.)

### *"Lower Priced" Coal Moisture Deduction*

During the relevant periods Amax sold coal at a specified price per ton, (Exhibits 7–73; Stipulation, ¶ 11), and the price paid by Amax's customers included no express deduction for the inevitable moisture content—total or excess. (Tr. at 54, 295–96, 489, 499–500.) Contract specifications, however, require that the delivered coal burn at a minimum number of British Thermal Units ("Btu")[6] and further require that the delivered product not deviate from designated parameters for moisture, ash, and sulphur. (Tr. at 60.) Although testimony indicated that during the Quarters In Issue the contract moisture specification was never changed or even discussed in negotiations, (Tr. at 51, 81, 89), the operative effect of the contracts, as discussed below, speak for themselves.

Excess moisture does not contribute to the overall Btu value of coal; indeed its effect is quite the contrary. Excess moisture, however, is not without value within the coal industry. A certain percentage of excess moisture is required for proper boiler operation and moisture is also a necessary evil for coal management. A pure fossil fuel is only an ideal. Accordingly, utility companies buy

---

6. A Btu is a measure of the amount of energy a solid will produce when burned. One Btu is the quantity of heat required to raise the tempera- ture of one pound of water one degree Fahrenheit.

boilers "specifically designed for levels of ash fusion temperatures, as well as grindabilities, as well as the moisture in the coal and the ash content in the coal. And if the coal delivered to that particular system is outside of those limits, it will impact the overall bussbar cost of producing energy." (Tr. at 54.) Boilers also require pulverized coal, thus utility companies invariably require Amax to provide coal crushed to a maximum size of two inches—the remaining size reduction typically conducted by the utility. (*See* Note 4, *supra.*) The increased surface area inevitably leads to increased excess moisture which, in turn, drives up the overall cost of the coal through the associated non-Btu producing tonnages. The alternative to selling coal laden with excess moisture is drying the coal in thermal dryers prior to weighing— something Amax pursued in attempting to produce a more refined product. Amax discovered, however, that "dry coal" is not a viable or even marketable alternative. Coal without excess moisture creates a product and fuel management problem: the coal generates extreme amounts of dust and is highly prone to spontaneous combustion. (Tr. at 89, 103, 106–07, 489.)

A "pure" or "dry" coal remains on the horizon not by choice of producers or consumers, but by the limitation of technology. The accepted reality of those within the coal industry that testified at trial is that coal deliveries include excess moisture.[7] (Tr. at 483–85.) Excess moisture lowers the overall Btu value per ton but increases the actual or effective price per ton of coal higher than that stated in the contract for the putative "product" containing coal and moisture. Amax's customers often guard against paying coal prices for excess moisture by a "Calorific Value" adjustment or component—meaning overall Btu values below specifications will lower the overall price. (Tr. at 376–77; *see also* Exhibit 8 at p. 384, Exhibit 9 at 584, Exhibit 9–3 at 881, 911.) Other Amax contracts contain a "deadband" provision where-

by no price adjustment will be made to the price if the Btus per pound stay within a specified range. A deadband provision is an administrative convenience allowing the parties to get about their business without making adjustments for every shipment. (Tr. at 375; Exhibit G–33 at 67, Exhibits 7 through 14, and Exhibits 26 through 70.)

### *Measurement of Excess Moisture*

Subsequent to the Taft decision, the I.R.S. issued Revenue Ruling 86–96 indicating that "[t]he Service will allow a calculated reduction of taxable weight of excess moisture, *but only where the taxpayer can demonstrate through competent evidence that there is a reasonable basis for its determination of the existence, and amount, of excess moisture.*" Rev.Rul. 86–96, 1986–2 C.B. 181 (emphasis added). In this case the parties stipulate to the existence of excess moisture, but dispute the amount for deduction purposes-specifically the reasonableness of Amax's calculations. However, neither in Revenue Ruling 86–96, nor in the time since 1986, has the IRS provided guidance to taxpayers with respect to what "reasonable" coal sampling and/or testing procedures might or might not be. (Tr. at 206; *see also* Rev.Rul. 86–96.)

During the Quarters In Issue the only published standards to determine inherent and excess moisture were those of the American Society for Testing and Materials ("ASTM"). (Tr. at 229.) ASTM standards, however, "become legally binding only when a government body references them in regulations, or when they are cited in a contract." ASTM, Annual Book of ASTM Standards at *iv.* (1995). For the period at issue the only regulatory guidance for excess moisture calculations was, though in no way directly applicable, by the Department of the Interior's Office of Surface Mining (OSM), which prescribed use of ASTM standard D1412.[8] (*See* 30 C.F.R. § 870.18; Tr. at 145.) The OSM expressed concerns over a potential "bias" in

---

7. "In essence, a coal operator is selling both coal and water to file buyer. The buyer knows this, and this reality is standard within the coal industry." McGee, *Coal Royalty Valuation: The Federal Perspective*, 97 W.Va.L.Rev. 887, 904 (1995).

8. In 1988, OSM promulgated 30 C.F.R. § 870.18, whereby excess moisture reductions were available for the first time in connection with abandoned mine reclamation excise taxes paid by coal producers under the Federal Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1232.

ASTM equilibrium moisture standards under D1412 which may "yield erratic results on some subituminous and lignite coals", but nonetheless adopted ASTM D1412 as the only available standard and being otherwise acceptable under the then current state of knowledge. (*See* Exhibit 89; 53 Fed.Reg. 19718–726.) Moreover, ASTM Standard D1412 was not fully developed in that it specified no protocol for sample collection and treatment. (Tr. at 206.)

During the Quarters In Issue, Amax followed ASTM D1412 (equilibrium/inherent moisture) and ASTM D3302 (total moisture) testing standards to calculate excess moisture for tax deduction purposes. (Tr. at 98–99.) To establish the excess moisture deduction applicable to approximately 120 million tons of coal for the years 1988–91, Amax conducted the following procedure at each mine: (1) sampled each shipment under ASTM procedures, (Tr. at 113, 119); (2) tested each shipment for total moisture under ASTM D3302, (Tr. at 119); (3) tested monthly shipment samples to establish equilibrium moisture as the inherent moisture under ASTM D1412 [9], (Tr. at 98–99, 138), and (4) used the prior year's average monthly equilibrium (inherent) moisture and the weighted average total moisture to establish the excess moisture in its quarterly returns.

The IRS finds fault with Amax's methodology in one or more of the following ways: (1) the ASTM D1412 equilibrium moisture tests should not be used to establish inherent moisture for the subituminous C coal at the Powder River mines; (2) the use of monthly equilibrium moisture tests which were then averaged for a yearly inherent moisture at each mine and applied in the immediately following year(s) was improper; (3) the use of shipment samples was improper; and (4) there were various problems with a few of the samples and test results which the IRS hand-picked from well in excess of 10,000 test results.

## Conclusions of Law

This Court has jurisdiction in this tax refund matter pursuant to 28 U.S.C. § 1346(a)(1). (*See* Stipulation Of The Parties, ¶ ¶ 1–3, 10, 16.) The United States' taxing authority relevant to the present dispute is enumerated at 26 U.S.C. § 4121. *See* Note 3, *supra.* During the period at issue Amax was a "producer" as defined by § 4121, and thereby subject to the tax applicable thereunder.

This is a taxpayer refund action, thus Amax bears the burden of establishing that it has in fact overpaid its taxes, not merely that the Commissioner's determination was incorrect. *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932) ("[T]he ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax."). The parties arguments center on two issues: (1) whether coal priced below the applicable "threshold" limitation may account for moisture, *i.e.,* whether a coal producer using the 4.4% limitation may properly take a moisture deduction; and (2) whether Amax properly measured the amount of excess moisture during the Quarters In Issue. The first is a matter of statutory construction with reference to the contracts relevant to the Quarters In Issue; the latter requires a determination of whether Amax has established its calculations with competent evidence. Each will be addressed in turn.

### *Lower Priced Coal*

As always, statutory analysis must first begin with the statute itself, *Commissioner v. Engle,* 464 U.S. 206, 214, 104 S.Ct. 597, 602–03, 78 L.Ed.2d 420 (1984). The relevant statute here reads in relevant part:

(a) **Tax imposed.** (1) **In General.** There is hereby imposed on coal from mines located in the United States sold by the producer, a tax equal to the rate

---

9. "The coal sample to be tested is prepared to a specific top size per the ASTM test method. That coal then under strictly controlled conditions of temperature and relative humidity is attempted to be returned to a hundred-percent-saturated moisture-containing status, and at the end of that period of equilibration, a total moisture test is determined on that sample that has been subjected to those conditions to determine the percent equilibrium moisture." (Tr. at 147.)

per ton determined under subsection (b).

**(2) Limitation on tax.** The amount of the tax imposed by paragraph (1) with respect to a ton of coal shall not exceed the applicable percentage (determined under subsection (b)) of the price at which such ton of coal is sold by the producer.

**(b) Determination of rates and limitation on tax.** For purposes of subsection (a)—

(1) the rate of tax on coal from underground mines shall be $1.10,

(2) the rate of tax on coal from surface mines shall be $.55, and

(3) the applicable percentage shall be 4.4 percent.

26 U.S.C. § 4121.

As discussed above, "coal" is not defined by the statute. In *A.J. Taft, supra,* a federal district court in the Northern District of Alabama concluded that the meaning of "coal" under § 4121 could not be "reasonably interpreted to require the inclusion of water which is excess to inherent moisture content. . . ." 605 F.Supp. at 372. In a seeming case of first impression, the IRS elected to forego a defense at trial, 605 F.Supp. at 370, and has been attempting to live down *Taft* ever since—*Taft* was affirmed by the Eleventh Circuit Federal Court of Appeals and adopted by the I.R.S. in a 1986 revenue ruling. But the coal sold in *Taft* was not necessarily priced below the applicable limitation threshold. Actually, the 4.4% (then 2%) limitation was addressed only when presenting the language of the statute and was the subject of no substantive discussion. *Taft* therefore did not address whether "coal", when priced below the threshold, includes excess moisture for taxation purposes.

The question left unaddressed in *Taft* was the subject of a Court of Claims opinion in *Costain Coal, Inc. v. United States,* 36 Fed.Cl. 38 (1996): All coal at issue in *Costain* was from underground mines and priced below the $25 threshold. 36 Fed.Cl. at 40. The relevant contracts in *Costain* required the coal producer to

deliver coal that had both a specified Btu (British Thermal Unit) content, and which did not contain specified levels of moisture, ash and sulphur. If [the coal producer] delivered coal that satisfied these contract specifications, its customers were required to pay a fixed price per ton. If the coal delivered did not meet these contract specifications, the customers could either reject the delivery or reduce the price paid per ton according to a fixed schedule.

*Id.*

The coal producer in *Costain* argued, similar to Amax here, that it prices and sells a "coal product" which includes coal and excess moisture, among other impurities. Taxation, the coal producers argue, should occur only where "coal" is concerned. The Court of Claims, though, concluded it was unreasonable to allocate a portion of the sales price to the excess moisture present in the coal. 36 Fed.Cl. at 43; *see also A.J. Taft Coal, Inc. v. Connors,* 906 F.2d 539, 544 (11th Cir.1990) ("Alabama Power did not purchase a 'coal product' consisting of coal and excess moisture; it purchased coal alone. [The producer] threw in the water for free."). That is to say, moisture need not be deducted for taxation purposes because it was never included in the purchase price. *See* 36 Fed.Cl. at 43 n. 3 ("There is no evidence in this case supporting a finding that one ton of excess moisture is equal in value to one ton of 'coal.' ").

Facially *Costain* and *Taft* seem inconsistent, but upon further review sound reasoning indicates that taxation of the coal above or below the applicable threshold is more than a distinction without a difference. Consider the following illustration taken from the *Costain* opinion:

One hundred tons of surface mined coal product, in this case 95% coal and 5% excess moisture, sells for $10.00 per ton = total price of $1000.00. If the 4.4% limitation is applied (as it should be as the price is below $12.50 threshold), the tax may not exceed 4.4% of $10.00, or a rate of $.44 per ton, thus total taxation on 95 tons is $41.80. But this assumes a portion of the sales price is allocated to the excess moisture. If $1000.00 was paid for 95 tons of coal, the

actual price per ton of coal is $10.53 per ton. Applying the 4.4% limitation to the actual price of coal, the tax rate must be $.46 per ton which, for the 95 tons is a total tax of $43.70.

See 36 Fed.Cl. at 40–41. *Costain* does not impinge upon *Taft.* The term "coal" is famously underdefined by § 4121 and the applicable regulations, *see Holmes Limestone Company v. United States,* 946 F.Supp. 1310, 1318–19 (N.D.Ohio 1996); *Costain,* 36 Fed. Cl. at 40; *Taft* at 372, but it is important to note when reading § 4121(a)(2) the term "coal" is used more than once: "There is hereby imposed on coal ... sold by the producer, a tax equal to the rate ... per ton ... [which] shall not exceed [4.4%] ... of the price at which such ton of coal is sold by the producer." 26 U.S.C. § 4121(a)(2) (emphasis added). *Taft* defines the first "coal" to exclude moisture without reaching the next relevant usage. The *Costain* court was forced reach beyond *Taft* and held that "coal" cannot cut both ways: "coal" as used throughout § 4121 excludes excess moisture, therefore, the 4.4% limitation must apply only to the effective price of coal sold, not the overall coal product price. To do otherwise would create a conflict within the statute and run contrary to well established rules of construction. *See United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 512 n. 5, 112 S.Ct. 2102, 2107 n. 5, 119 L.Ed.2d 308 (1992) ("[N]ormal canons of construction caution us to read the statute as a whole, and, unless there is a good reason, to adopt a consistent interpretation of a term used in more than one place within the statute.").

█ Amax wishes to argue that the facts at bar distinguish it from *Costain.* The *Costain* contracts contained moisture level specifications which, if exceeded, allowed the purchaser to reject the shipment or "reduce the price paid per ton according to a fixed schedule." *See* 36 Fed.Cl. at 40. Amax argues that either the excess moisture has value under their contracts or that the lack of moisture level negotiations indicate that Amax customers were somehow indifferent to the level of excess moisture in the purchased coal. Amax's arguments must be rejected. The value of excess moisture sold with coal, if any, is insignificant. Amax's

customers buy coal, and coal alone. The incidental value of excess moisture in handling of coal is only due to the limitations of technology. It would strain logic to assume that purchasers actually want excess moisture in their coal where contracts invariably set maximum levels of moisture but never minimum levels. Excess moisture in coal is an unavoidable and accepted reality within the industry. Further, Amax's contracts do not substantially vary from those in *Costain.* This much is indicated by the plain language of either the calorific adjustment components or, where applicable, deadband provisions. *Costain* cannot be factually distinguished, nor can Amax overcome its sound statutory construction. *Taft* remains intact for coal priced above the relevant thresholds, but where the § 4121(a)(2) limitation is utilized, taxes must be calculated by the "effective" or "actual" price of coal. "Coal", therefore, does not include excess moisture throughout § 4121.

Judgment on this issue will be entered in favor of the United States and against Amax. Amax is accordingly not entitled to a refund of BLET paid for the Powder River Mines and that small portion of the coal from the Wabash Mine priced below $25.00. To whatever extent this ruling is inconsistent with the Court's prior ruling in *AMAX Coal Co. v. United States,* 932 F.Supp. 226 (S.D.Ind. 1996), that opinion is hereby **ORDERED VACATED.**

### *"Reasonable Basis"*

█ The second major issue of this action is whether Amax properly claimed its moisture deductions during the Quarters In Issue. The parties differ dramatically on what must be proven for Amax to be victorious. Revenue Ruling 86–96 provides that "[t]he Service will allow a calculated reduction of the taxable weight of coal, for the weight of excess moisture, but only where the taxpayer can demonstrate through competent evidence that there is a reasonable basis for its determination of the existence, and amount, of excess moisture." Rev.Rul. 86–96, 1986–2 CB 181 (1986). Amax runs with this language and asserts to the Court that in order to prevail it need only establish that it had a

reasonable basis for its deduction. The IRS scoffs at this notion claiming that Amax must prove that (1) the Commissioner's findings were incorrect; and (2) Amax overpaid its BLET liability by the amount claimed. *See, e.g., Gowran v. Commissioner,* 87 F.2d 125, 127 (7th Cir.1937), *aff'd sub nom., Helvering v. Gowran,* 302 U.S. 238, 246, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937). The Revenue Ruling, the IRS claims, is effectively meaningless in this proceeding—a tax refund suit is a trial *de novo,* and is not a review of the agency determination. *See Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir.1987). The logic proffered by the IRS is somewhat like a dog chasing its tail: *Lewis v. Reynolds* and its progeny remain the cornerstone of tax refund jurisprudence, but in this case in order to determine whether Amax overpaid, the Court must address whether Amax had a reasonable basis for the refund claim. *See Holmes Limestone Company v. United States,* 946 F.Supp. 1310, 1323–24 (N.D.Ohio 1996).

What a "reasonable basis" is here, of course, is not addressed by the parties. "Reasonable basis" is an all too common phrase in law. In Constitutional jurisprudence, a reasonable basis can be something merely plausible, *see, e.g., Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992), but as an evidentiary issue, as here, a reasonable basis can be found where the facts considered together support a particular position to a justifiable certainty. *See, e.g., United States v. Carmack,* 100 F.3d 1271, 1277–78 (7th Cir.1996) (in criminal drug conspiracy various forms of evidence provided reasonable basis for determining amount of marijuana attributable to the defendant); *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 865 (7th Cir.1996) (employment discrimination action whereunder employer's evidence provided reasonable basis to support its legitimate nondiscriminatory firing decision); *Hospital Resource Personnel, Inc. v. United States,* 68 F.3d 421, 425–27 (11th Cir.1995) (reliance on revenue ruling provided reasonable basis for taxpayer to claim independent contractor safe haven of § 530(a)(2)(A) of the Revenue Act of 1978, codified and amended at 26 U.S.C. § 3401 note); *United States v. Gertner,* 65 F.3d 963,

972 (1st Cir.1995) (conclusory declaration alone insufficient for needed reasonable basis for IRS to issue John Doe warrant under 26 U.S.C. § 7609(f)). Looking specifically within tax jurisprudence, a victorious refund claimant has a right to reasonable attorney's fees under 26 U.S.C. § 7430(a) if the Government's position was not "substantially justified". The Supreme Court has defined "substantially justified" as having a "reasonable basis both in law and in fact" or sufficient to *"satisfy a reasonable person." Pierce v. Underwood,* 487 U.S. 552, 563–65, 108 S.Ct. 2541, 2549, 101 L.Ed.2d 490 (1988) (emphasis added). This determination involves a review of all the facts as well as any legal precedent. *See Wilfong v. United States,* 991 F.2d 359, 364–66 (7th Cir.1993).

The only available opinion on reasonableness under the applicable revenue ruling is *Holmes Limestone, supra.* In *Holmes Limestone* a federal district court from the Northern District of Ohio considered the inherent moisture levels in a northern Ohio coal field during the relevant period of 1982 through 1988. The *Holmes Limestone* court lacked the voluminous evidence before this Court: plaintiff therein proffered general "guesstimates" and 13 core samples taken in 1979–80; the Government's evidence consisted of "thirteen relevant samples tested and collected between 1974 and 1994 in a Penn State University Coal Data Base", a 1978 "Information Circular", and values taken south of the coal fields at issue. *See Holmes Limestone, supra,* * 15. From this evidence the *Holmes Limestone* court nonetheless concluded the inherent moisture could be found to a reasonable certainty.

■ In this case the Court concludes that Amax has demonstrated by competent evidence that it had a reasonable basis for its claimed moisture deductions. This finding is made in view of all the facts and the glaring lack of regulatory guidance. Amax has demonstrated that it went to comparatively great lengths to satisfy its obligation to establish a reasonable basis for its deduction. Absent regulatory guidance, Amax followed the only available industry direction, the ASTM standards. The IRS claims ASTM D1412 was improperly utilized due to potential for

"bias". No reasonable person can conclude the only available scientific testing methods were improperly applied. *See Pierce, supra,* 487 U.S. at 563–65, 108 S.Ct. at 2549. To the extent the IRS seeks to refute the use of any particular ASTM standard, this is a request for this Court to sit as a super science tribunal judging the published methods of the scientific community. To the extent the IRS argues Amax improperly utilized ASTM standards, the IRS second-guesses the application of standards to which it will not readily acquiesce. ASTM failures in attempting to formulate competent evidence where the IRS has otherwise failed to provide guidance affords the IRS no poaching rights. That is, the issue here is whether Arnax had a reasonable basis to claim its deductions. The answer, in light of all circumstances, is yes. The IRS should not seek to regulate by litigation.

### *Amount of Refund*

Amax loses the first issue but wins the second. Beyond the 4.4% limitation issue, Amax has a reasonable basis for its claims and is entitled to a refund in the amount of two hundred seventy-six thousand, three hundred ninety-nine dollars and one cent ($276,399.01). This figure is derived from the following excess moisture totals derived from the associated mine: Chinook, $38,758.88; Minnehaha, $13,283.74; Ayrshire, $32,166.99; Delta, $21,952.19; and Wabash, $170,237.21. (Exhibit 99; Exhibit A to Amax's Post–Trial Brief; Exhibit G–8 at 11–12, 27–29 & 44–46.) This refund is equal to all amounts claimed not affected by the § 4121(a)(2) limitation.

### Conclusion

Judgment shall enter as follows:

On the issue of whether Plaintiff may take a moisture deduction where the 4.4 % limitation is applicable, Judgment is entered in favor the Defendant and against Plaintiff. Plaintiff's claim for a refund is therefore rejected to that end.

On the issue of whether Plaintiff properly calculated excess moisture levels for purposes of declaring a tax deduction, Judgment is entered in favor of the Plaintiff and against the Defendant. Plaintiff's claim for a refund is therefore granted to this end and Plaintiff is entitled to a refund in the amount of two hundred seventy-six thousand, three hundred ninety-nine dollars and one cent ($276,399.01) with interest first accruing from the date of the original assessment.