**A.J. TAFT COAL, INC., et al.,**
**Plaintiffs–Appellees,**

v.

**Joseph P. CONNORS, Sr., Donald E. Pierce, Jr., William Miller, et al., Defendants–Appellants.**

**Joseph P. CONNORS, Sr., Donald E. Pierce, Jr., William Miller, et al., Plaintiffs–Appellants,**

v.

**DRUMMOND COAL COMPANY, INC.; Alabama By–Products Corporation, Defendants–Appellees.**

No. 89–7323.

United States Court of Appeals, Eleventh Circuit.

July 19, 1990.

Stephen J. Pollak, Wendy S. White, Shea & Gardner, David W. Allen, Washington, D.C., Margaret M. Topps, Patrick K. Nakamura, Stropp & Nakamura, Birmingham, Ala., for defendants-appellants and plaintiffs-appellants.

Charles A. Powell, III, Powell, Tally & Fredercik, David M. Smith, Fournier J. Gale, III, Maynard, Cooper, Frierson & Gale, P.C., Birmingham, Ala., for A.J. Taft Coal, Inc.

Before COX, Circuit Judge, HILL[*] and SMITH[**], Senior Circuit Judges.

COX, Circuit Judge:

This case involves two declaratory judgment actions which were consolidated for trial in the Northern District of Alabama. The first action, filed in January 1986 in the United States District Court for the District of Columbia, was brought by the Trustees of the United Mine Workers Health and Retirement Funds (the "Funds") against two Alabama coal producers, Drummond Coal Company and Alabama By–Products Corporation, and one Kentucky producer, Island Creek Coal Company. Pursuant to a collectively bargained agreement, these and other signatory coal producers agreed to contribute to the Funds a fixed amount of money per ton of coal produced for use or for sale. The Trustees sought a judgment that would compel the defendants to pay their tonnage contributions to the Funds without any deduction for excess moisture in the coal.

---

[*] See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

Shortly after this lawsuit was filed, an Alabama coal producer, the A.J. Taft Coal Company, sued the Trustees in the Northern District of Alabama (case number CV–86–H–0245–S) on behalf of itself and certain other Alabama coal producers who were signatories to a National Bituminous Coal Wage Agreement. The case proceeded as a class action with Taft representing coal producers who calculated their contributions to the Funds based on coal tonnages reduced by an amount representing excess moisture in the coal when weighed, but which was not a natural or inherent part of the coal itself. The Taft plaintiffs sought a judgment approving of their method of calculating tonnage contributions to the Funds. The plaintiffs also sought an injunction to prevent the Trustees from enforcing newly issued instructions on tonnage contributions (which specifically disallowed deductions for excess moisture in the coal), unless and until each class member agreed to modify the procedure through collective bargaining.

Pursuant to a stipulation between the parties, the District Court for the District of Columbia severed the Alabama producers from the lawsuit in that court and transferred the case, as to those defendants, to the Northern District of Alabama (case number CV–86–H–0724–S). Since the disputes in these two suits are identical, the cases were consolidated. In April 1989, the district court entered judgment in favor of the Taft class coal producers and the Trustees appealed. We affirm.

## I. BACKGROUND AND FACTS

This is the second time this case has been appealed. *See A.J. Taft Coal Co., Inc. v. Connors, et al.,* 829 F.2d 1577 (11th Cir. 1987). The first time, the district court had granted Taft's motion for summary judgment on the merits of the moisture deduction issue on the ground that previously the issue had been decided adversely to the Trustees in *Combs v. Sun–Up Coal Co.,* No. CV80–P–236–J (N.D.Ala. Aug. 12, 1980). This court reversed the district court and remanded for a trial on the merits, holding that *Combs* could not be used for offensive collateral estoppel, since the prior ruling on the moisture deduction issue was not crucial and necessary to the holding in that case. The previous opinion in this case contains a good exposition of the facts, and so we now quote from it at length:

A.J. Taft Coal Company (Taft) brought this class action on behalf of all Alabama coal companies who are signatory to the National Bituminous Coal Wage Agreement (NBCWA) seeking a declaratory judgment and permanent injunction against the Trustees of the United Mine Workers of America Health and Retirement Funds (the Funds), a nationwide multi-employer plan. The coal companies contribute to the Funds under the NBCWA based on a set amount per ton of coal they produced.[1] Taft contends that the calculation of the amount of coal it produces should be reduced to account for any extraneous moisture in the coal.[2] ... The Trustees filed a counterclaim against the class members alleging that

**1.** [1. This and the following four footnotes are drawn from the opinion reported at 829 F.2d 1577. The bracketed number at the beginning of the note designates that footnote's numbering in the prior opinion.]

Article XX(d) of the 1984 NBCWA, in part, provides:

(d) Contributions by Employers

(1) During the life of this Agreement, for the periods of time indicated below, each signatory Employer engaged in the production of coal shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal produced by each Employer for use or for sale * * *

This clause, requiring employer contributions based on tons of coal produced for use or sale, has been used in each contract since the 1946 NBCWA created the United Mine Workers' Welfare and Retirement Fund. The NBCWA contract is renegotiated roughly every three years; the current version was signed in 1984.

**2.** [2] Extraneous moisture is that which is over and above the normal moisture of coal in its natural state. This excess moisture increases the weight of the coal and thus, the pension contribution, based on the weight of the coal is also increased.

they were delinquent on their contributions to the Funds by claiming an extraneous moisture deduction when calculating their contributions to the Funds because a moisture deduction was not allowed under their interpretation of the NBCWA.

\* \* \* \* \* \*

Since 1980,[3] Taft has made its monthly contribution to the Fund by calculating the tons of coal produced for use or sale after it has processed or washed the coal as required by the end use of the coal.[4] The Alabama coal companies, for whom Taft spoke, also reduced their pension fund contributions in consideration of the amount of extraneous moisture in the coal produced. Alabama coal companies commonly exclude extraneous moisture in calculating the tons of coal produced because that is the method used to levy Alabama state taxes. We have only been directed to two companies outside Alabama who have been allowed excess moisture deductions under the NBCWA.[5]

Apparently, by 1983, word had spread in the industry that Alabama coal companies were allowed a moisture deduction for any excess moisture they could adequately document. Prompted by this, the Trustees mailed a letter on October 24, 1985, to all signatories of the contract, disallowing any moisture deductions for all contributions to the Funds made after that date. This attempt by the Trustees to devise a uniform national policy was construed by Taft as a unilateral change in the NBCWA. Taft brought this suit to prevent enforcement of this new interpretation of the NBCWA....

829 F.2d at 1578–79.

The letter referred to above was sent by Edward A. Day, Jr., the Funds' Director of Finance and Administration, and reads in part as follows:

> Article XX, Section (d) of the 1984 National Bituminous Coal Wage Agreement (the "Coal Wage Agreement") requires the payment of contributions to the UMWA Health and Retirement Funds (the "Funds") for each ton of coal produced for use or sale. It has recently come to the attention of the Funds' Trustees that certain coal producers, in computing the tonnage upon which the contributions are based, have taken deductions for moisture in excess of the amount of moisture inherent in coal in its natural state. Such deductions are contrary to the terms of the Coal Wage Agreement and inconsistent with the Funds' policy of not permitting deductions for added moisture or other impurities which may be found in the coal product.
>
> The Trustees recently reaffirmed the Funds' policy of requiring the remittance of contributions based on the weight of the coal produced without reductions for non-coal materials which may be contained in the coal product and instructed the Funds' staff to so advise the coal producers. Accordingly, please be advised that the calculation of tonnage contributions due to the Funds must be based upon the actual weight of the coal product without regard to the moisture content of the coal. Contributions which

---

**3.** [4] Taft became a signatory to the contract in 1971, but did not begin taking a moisture deduction until 1980.

**4.** [5] Taft derives its "tons produced" figure through laboratory analysis of the percentage of moisture in the total coal produced. Then a percentage representing the inherent moisture of coal, anywhere from 1.5% to 2.88%, is subtracted from the moisture percentage figure to arrive at the amount of extraneous water. The moisture percentage, representing extraneous moisture in the coal, is deducted from the total tonnage to compute the contribution to the Funds.

**5.** [6] One was a Colorado company who claimed that it dried its coal to zero percent moisture after production but prior to sale. The Trustees did not allow a total moisture deduction but allowed the company to deduct all moisture in excess of one percent. The second was a Kentucky company who was allowed to deduct a "reject" percentage for ash content and excessive moisture in 1979. However, the Trustees discontinued this allowance in 1983; the Kentucky company ceased operation shortly thereafter and the matter was never litigated.

are remitted to the Funds based on tonnage reductions due to the moisture content shall be considered deficient and will be processed by the Funds' staff as delinquent contributions.

## II. THE DISTRICT COURT OPINION

Since the credibility of witnesses was not of concern to the parties below, they agreed that the case should be decided by the court on the basis of the written materials submitted to the court, including affidavits, depositions, and exhibits identified to the court, a statement of facts in agreement and facts in dispute, and the pretrial order and briefs. The district court identified the issue at hand as "whether the trustees and the producers have agreed to calculate the weight of coal with or without extraneous moisture." The court agreed with the coal producers on each of their two principal arguments: First, that the terms of the NBCWA do not include "extraneous moisture" within the definition of the word "coal"; and second, that the Trustees have waived the right to interpret the contract to include extraneous moisture in the contribution calculation because of their longstanding practice of accepting these producers' reductions of coal weight by excess moisture amounts and, further, that any attempt by the Trustees to unilaterally reinterpret the tonnage contribution provision is beyond the scope of the Trustees' authority.

Prior to discussing the first of the coal producers' arguments, the court quoted the language at issue in the agreement, which states that all signatories "shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per ton on each ton of two thousand (2000) pounds of bituminous coal produced by such Employer for use or for sale...." The court noted that both sides agreed that this language has been included in and remained virtually unchanged in every National Bituminous Coal Wage Agreement since their inception in 1946. The court also noted the parties' agreement that the members of the Taft class had taken excess moisture deductions from at least as early as 1976 for some to as late as 1981 for others.

As to the first issue, the court disagreed with the Trustees' position that the word "coal" as used in Article XX(d) of the NBCWA was ambiguous because previous trustees, employers and unions had interpreted the word differently and that, therefore, the October 24, 1985 letter was a permissible effort to clarify ambiguous language. The court noted that "[h]ad the term 'coal material(s)' or something equally vague been used in the NBCWA then the trustees *may* have had an argument, but since simply the word 'coal' is used the court finds no ambiguity." To the contrary, the court found that the word "coal" as used in the contract was not ambiguous and that "coal" does not include extraneous moisture. In so finding, the court cited the definition of coal to which the Trustees had agreed:

5. A geological definition of coal is:

a readily combustible rock containing more than 50 percent by weight and more than 75 percent by volume of carbonaceous material including inherent moisture, formed from the compaction and induration of variously altered plant remains similar to those in peat. Differences in the kinds of plant materials (type), in degree of metamorphism (rank), and in the range of impurity (grade), are characteristic of coal and are used in classification.

6. Coal in its natural state contains moisture. That moisture is its 'inherent' or 'bed' moisture.

7. After coal is severed, it can acquire additional moisture from exposure to the elements and/or during preparation. That moisture is referred to as "excess" or "extraneous" moisture and does not become a chemical part of the coal.

Statement of Agreed Facts, p. 3. The court found this definition of coal to be reasonable and consistent with current Internal Revenue Service and Department of Interior regulations which recognize that extraneous moisture should not be included

in calculating the weight of coal.[6] Finally, the court distinguished *Drummond Coal Co. v. Watt*, 735 F.2d 469 (11th Cir.1984), in which this court stated that the Secretary of the Interior had the statutory authority to issue a detailed regulation mandating that extraneous moisture *not* be excluded from the weight of coal when calculating the producers' payments to a federal reclamation fund, and held that although that situation appears similar to this one, the Funds' Trustees had no such power to interpret the word "coal."

With regard to Taft's second argument, that the Trustees had waived the right to interpret "coal" as to include the weight of excess moisture, the district court simply agreed that given the Funds' history of having knowingly accepted contributions from these producers without the inclusion of excess moisture amounts, the present attempt "to unilaterally alter the interpretation of the agreement is arbitrary and capricious."

## III. DISCUSSION

The Trustees identify three issues on appeal. First, they argue that the district court erred in finding that "excess moisture" does not come within the definition of the word "coal," with the result that these Alabama coal producers can exclude the weight of excess moisture in calculating their contributions to the Funds. To this issue, the Trustees direct us to a clearly erroneous standard of review, but also insist that the court erred as a matter of law in interpreting a collectively bargained agreement. Second, the Trustees assert that the district court erred in holding that the Trustees' right to establish a uniform national policy disallowing excess moisture deductions had been waived because of prior actions by the Funds' auditors permitting such deductions when requested in Alabama. The Trustees assert that the standard of review on this issue is the clearly erroneous standard and also state that the ruling is contrary to the law of waiver and estoppel. Third, the Trustees contend that the court erred in holding that the Trustees' "promulgation of a uniform national policy prohibiting the deduction of excess moisture in calculating tonnage contributions [through the Funds' Finance and Administration Director's October 24, 1985 letter] was arbitrary and capricious." This holding, say the Trustees, was an error of law. We need reach only the first issue in affirming the district court.

The Trustees argue that the court erred in reaching the conclusion that "extraneous moisture" is not included within the meaning of the word "coal" by focusing its decision on the word "coal" without reference to the entire contract provision, which reads "coal produced ... for use or for sale." By so doing, the Trustees contend, the court effectively read out of the contract the important language *"produced for use or for sale."* Despite the Trustees' insistence that greater attention to this clause makes it magically clear that, as used in the wage agreement, "coal" actually means coal *plus* excess moisture, we do

---

**6.** Previously, the position of both the Internal Revenue Service and the Department of the Interior was that for purposes of calculating the weight of coal for the payment of the federal Black Lung tax and abandoned surface mine reclamation fees, coal producers had to include the weight of extraneous moisture. *See* Rev. Rul. 82–222, 1982–2 C.B. 295 and *Drummond Coal Co. v. Hodel*, 796 F.2d 503 (D.C.Cir.1986) (a case relied on heavily by the Trustees here), *cert. denied*, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987).

The IRS reversed its position to allow deductions for excess moisture, when demonstrable through competent evidence, in August 1986. Rev.Rul. 86–96, 1986–2 C.B. 181. Likewise, in regulations issued in May 1988 (codified at 30 C.F.R. § 870), the Department of the Interior

reversed itself to allow deductions for provable excess moisture. In a lengthy explanation of this turnaround, published in 53 FR 19718 (May 27, 1988), the agency issuing the new regulation voiced agreement with commenters who stated that coal operators should not be penalized through higher reclamation fees because they operate a coal washing operation or because their coal contains extraneous moisture due to rainfall or other sources. Later in the report, the authors of this regulation stated that "no overriding reason exists as to why operators should pay a fee on excess moisture."

Interestingly, contributions to the UMW Health and Retirement Funds are no longer calculated on the basis of tons of coal produced for use or for sale, but on an hours worked basis.

not agree. These are words of limitation; they do not expand the word "coal." When, as shown by the evidence, a purchaser such as Alabama Power Company [7] makes an adjustment in the price per ton of coal it purchases because the coal contains a measurable amount of excess water, the purchaser is buying the coal, not the water. *Accord, A.J. Taft Coal Co. v. United States,* 605 F.Supp. 366, 371 & n. 6 (N.D. Ala.1984) ("Although it may be a matter of semantics, the court does not necessarily view plaintiff's reliance on Alabama Power Company's moisture calculations as taking a *deduction.* It may be better described as a method by which the amount of *coal* was determined."), *aff'd mem.,* 760 F.2d 279, 280 (11th Cir.1985). That the purchaser chooses to make the adjustment in the price per ton rather than in the number of tons is irrelevant. The fact remains that the deduction is made for a specific, identifiable and measurable quantity of *water* contained in the mixture that *is not coal.*

None of the cases cited, nor what the parties characterize as the "legislative history" materials of the contribution provision, nor the fact that other coal producers not before this court contribute to the Funds on a tonnage basis that includes extraneous moisture, persuades us that the district court was wrong. "Coal" means "coal" and it is not an ambiguous term. The distinction we find between the cases cited by the Trustees and the case before us is that in those cases, royalties were due on product that was sold *as coal.* By contrast, Taft was never paid for excess water contained in the coal it sold to its customer, Alabama Power, because Alabama Power paid only for the coal it purchased, reducing the price it paid to account for the water. Consequently, Alabama Power did not purchase a "coal product" consisting of coal and excess moisture; it purchased coal alone. Taft threw in the water for free.

We agree with Taft that the "legislative history" of the national wage agreements provides no clear answer to what was intended by the drafters of the agreement relative to the excess moisture issue. To the extent we can glean anything from those documents, they indicate to us that excess moisture should or at least can be deducted from the weight of the coal in calculating contributions to the Funds. For example, in a 1946 letter sent by the federal Coal Mines Administrator to the president of the United Mine Workers Association discussing the meaning of the "tons produced for use or sale" provision, the Administrator wrote that "[c]leanings, dust and other *coal products* which result from processing the run of mine coal and which are *sold as coal* should also be treated as coal produced for the purposes" of payments to the Funds. R1–51–7–9. (emphasis added). We emphasize the language in this letter to note that the drafters apparently intended to assess the producers only when they sold (or used) something *as coal.*

The Trustees assert further that since the NBCWA is a national wage agreement, we should look to the practices of thousands of other coal producers who are not before this court to ascertain the meaning of "coal … produced for use or for sale." We reject this invitation, since the matter of how third parties calculate their tonnage contributions is irrelevant. The course of dealing between the parties who are before us suggests that extraneous moisture is not included within the word "coal." The district court was right when it suggested that had some vague term such as "coal material(s)" rather than simply "coal" been used in the pertinent language, then the Trustees might plausibly argue that the October 24, 1985 letter was a permissible step to clarify ambiguous language. In the October 24, 1985 letter, in their briefs, and at oral argument, the Trustees repeatedly asserted that the tonnage contributions are to be calculated on the weight of the "coal product." The words "coal product" do not appear in Article XX of the NBCWA. We conclude that the district court's finding that "coal" does not include "extraneous moisture" was not clearly erroneous.

Lastly, we address the Trustees' contention that the district court erred as a matter of law in its finding relative to the meaning of coal. Citing *Nachwalter v.*

---

**7.** The A.J. Taft Coal Company has an output contract with Alabama Power Company under which Alabama Power purchases all the coal that Taft produces.

*Christie,* 805 F.2d 956 (11th Cir.1986), in which the Trustees argued that no oral modification of these ERISA Plans was legally permissible so as to alter the meaning of coal and the method of calculating contributions, We agree that there was never any written modification, but there was never any oral modification, either. At some point, years ago, the producers came to an agreement with the Funds' Trustees, or with the Funds' auditors who were agents of the Trustees, as to the meaning of "coal." Alternatively, one might characterize their agreement as to the "method by which the amount of *coal* [is] determined." *A.J. Taft Coal Co. v. United States,* 605 F.Supp. 366, 371 & n. 6 (N.D.Ala.1984), *aff'd mem.,* 760 F.2d 279, 280 (11th Cir.1985). In any event, the decision to allow these producers to deduct excess moisture from the weight of the coal was a logical consequence of the unambiguous contract term "coal"; it was not a modification and therefore, *Nachwalter* is inapplicable.

In light of our conclusion that the district court correctly found that "excess moisture" is not included within the meaning of the term "coal," as used in the NBCWA, we do not reach the other arguments raised by the Trustees.

The decision of the district court is AFFIRMED.