**COSTAIN COAL, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

**No. 96–5133.**

United States Court of Appeals, Federal Circuit.

Oct. 1, 1997.

Douglas P. Romaine, Stoll, Keenon & Park, LLP, Lexington, KY, argued for plaintiff-appellant. With him on the brief were Lisbeth Ann Tully and Melissa A. Stewart.

Joan I. Oppenheimer, Attorney, Tax Division, Department of Justice, Washington, DC, argued for defendant-appellee. With her on the brief were Loretta C. Argrett, Assistant Attorney General, and Kenneth L. Greene, Attorney.

Before RICH, PLAGER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Costain Coal, Inc. ("Costain") appeals from the July 1, 1996 judgment of the United States Court of Federal Claims, denying Costain's motion for summary judgment and granting the government's cross-motion in Costain's suit for a refund of federal excise taxes imposed on the sale of coal pursuant to Internal Revenue Code § 4121. *Costain Coal, Inc. v. United States*, 36 Fed. Cl. 38 (1996). In its decision, the court calculated the amount of tax due under section 4121 by determining the price charged by a producer for a ton of coal, where "coal" did not include any excess moisture and where no part of the price stated in the contract of sale was allocated for the excess moisture. Accordingly, the court upheld the Internal Revenue Service's ("IRS") calculation of the tax due and rejected Costain's claim for a refund. We affirm.

## BACKGROUND

### I.

Section 4121 of the Internal Revenue Code imposes an excise tax on the sale of coal. It provides in pertinent part as follows:

(a) Tax imposed. -

(1) In general.—There is hereby imposed on coal from mines located in the United States sold by the producer, a tax equal to the rate per ton determined under subsection (b).

(2) Limitation on tax.—The amount of the tax imposed by paragraph (1) with respect to a ton of coal shall not exceed the applicable percentage (determined under subsection (b)) of the price at which such ton of coal is sold by the producer.

(b) Determination of rates and limitations on tax.—For purposes of subsection (a) -

(1) the rate of tax on coal from underground mines shall be $1.10,

(2) the rate of tax on coal from surface mines shall be $.55, and

(3) the applicable percentage shall be 4.4 percent.

26 U.S.C. § 4121 (1994).

The coal at issue in this case is from underground mines. In general, pursuant to section 4121(a)(1), a flat rate of $1.10 per ton is assessed on the sale of such coal. However, if the coal is sold by the producer for less than $25.00 per ton, subsection (a)(2) serves to limit the applicable tax to an ad valorem rate of 4.4% of the price at which the coal is sold by the producer.[1]

In 1986, the IRS published Revenue Ruling 86–96, 1986–2 C.B. 181, to carry out the recently-issued decision in *A.J. Taft Coal Co. v. United States*, 605 F.Supp. 366 (N.D.Ala. 1984), *aff'd*, 760 F.2d 280 (11th Cir.1985) (table) (*Taft I* ). *Taft I* held that the term "coal," as used in section 4121, did not include water in excess of the inherent moisture content of the coal.[2] In its Revenue Ruling, the IRS stated:

For purposes of the tax imposed by section 4121 of the Code, the Internal Revenue Service will follow the *Taft Coal Co.* [*Taft I* ] decision regarding the moisture content of coal. The Service will allow a calculated reduction of taxable weight of coal for the weight of excess moisture, but only where the taxpayer can demonstrate through competent evidence that there is a reasonable basis for its determination of the existence, and amount, of excess moisture.

Rev. Rul. 86–96, 1986–2 C.B. 181.

II.

Costain is the successor in interest to Pyro Mining Company ("Pyro Mining") and to Pyro Alcoa Coal Company ("Pyro Alcoa"). Pyro Mining and Pyro Alcoa entered into contracts with their customers under which they agreed to deliver coal having a specified BTU[3] content, and which did not contain moisture, ash or sulfur in excess of specified amounts. If coal meeting those requirements was delivered, the customer paid a fixed price per ton. However, if the coal delivered failed to meet those requirements, then the customer could either reject the delivery or reduce the price paid per ton according to a fixed schedule.

Pursuant to their contracts, during the taxable quarters October 1, 1985, to December 31, 1988, Pyro Mining and Pyro Alcoa[4] sold coal from underground mines for less than $25.00 per ton, thereby bringing into play the 4.4% ad valorem rate limitation of section 4121(a)(2). In determining the amount of excise tax due, the IRS calculated the price of a ton of coal under section 4121(a)(2) by determining the actual amount of coal being sold—that is, minus the excess moisture—and dividing the stated contract price by that amount. The IRS then calculated the tax due by multiplying the price of a ton of coal by 4.4%.

---

1. Twenty five dollars per ton is the price that brings into play the limitation of subsection (a)(2). This is because 4.4% of $25.00 is $1.10.

2. Excess moisture is that moisture in excess of the inherent moisture present in coal in its undisturbed state. Inherent moisture is the total natural complement of moisture, both free and chemically combined, present in coal in its natural undisturbed state.

3. The BTU (British Thermal Unit) content of coal is a measure of the amount of energy that the coal will produce when burned.

4. There is no dispute that both Pyro Mining and Pyro Alcoa were "producers" within the meaning of section 4121 and were subject to the excise tax. *See Costain*, 36 Fed. Cl. at 39.

In due course, after paying the assessed taxes, Pyro Mining and Pyro Alcoa filed refund claims with the IRS, asserting that it had used an incorrect method for calculating the amount of excise taxes due.[5] The IRS denied the claims, and Costain—as successor in interest to the two companies—filed two tax refund suits in the Court of Federal Claims. The suits were consolidated before the court.

### III.

The issue presented before the Court of Federal Claims was how to determine the "price at which such ton of coal is sold by the producer" for purposes of calculating the excise tax under 26 U.S.C. § 4121(a)(2). In order to help illustrate their respective positions, the parties joined in posing a hypothetical situation in which "a producer of underground coal sells 100 tons of 'product' for a stated contract price of $20 per ton, and ... the 'product' sold is 95 percent coal and 5 percent excess moisture." *Costain*, 36 Fed. Cl. at 40. Based upon this hypothetical, the parties' positions were stated as follows:

a. *Plaintiff's Calculation.* Applying the definition of "coal" used in the *Taft Coal [Taft I]* decision, only 95 tons (95% of the 100 tons of material sold) is "coal" sold for a total price of $2,000. Since the purchaser is purchasing products consisting in this case of water which is exempt from tax and coal which is taxable at a stated price based on tonnage, the purchase price must be allocated proportionately resulting in a price per ton of ($2,000 × 95% divided by 95 tons). Pursuant to §§ 4121(a)(1) and (b)(1), for coal from underground mines, the tax is imposed at a rate is [sic] $1.10 per ton. However, §§ 4121(a)(2) and (b)(3) provide a limitation on the rate of tax imposed. The rate may not exceed 4.4% of the price at which the ton of coal is sold by the producer. Thus, the rate per ton may not exceed 4.4% of $20.00, or $0.88 per ton. Since the limitation applies, the tax is imposed at the rate of $0.88 for 95 tons of "coal" or $83.60.

b. *Defendant's Calculation.* Applying the definition of "coal" used in the *Taft*

*Coal [Taft I]* decision, only 95 tons (95% of the 100 tons of material sold) is taxable coal sold for a total price of $2,000. The other 5 tons of material is excess moisture that is not "coal" and is therefore not subject to the tax. Since $2,000 has been paid for 95 tons of taxable coal, the effective price is $21.05 per ton of taxable coal. Pursuant to §§ 4121(a)(1) and (b)(1), for coal from underground mines, the tax is imposed at a rate of $1.10 per ton. However, §§ 4121(a)(2) and (b)(3) provide a limitation on the rate of tax imposed. The rate may not exceed 4.4% of the price at which the ton of coal is sold by the producer. Thus, the rate per ton may not exceed 4.4% of $21.05 or $0.93 per ton. Since the limitation applies, the tax imposed on this sale is limited to the rate of $0.93 for 95 tons of taxable coal, or $88.35.

*See id.* at 40–41.

In the Court of Federal Claims, Costain argued that the excise taxes paid by Pyro Mining and Pyro Alcoa should have been computed based upon the first methodology above. The IRS had used the second methodology, which resulted in higher taxes. Costain sought to recover the differences between the taxes paid under the IRS's methodology and the taxes that would have been paid under Costain's methodology.

On cross-motions for summary judgment, the Court of Federal Claims determined that the government's approach correctly determined the "price at which such ton of coal is sold by the producer" under section 4121. *Id.* at 43. The court rejected Costain's contention that the term "price," as used in section 4121(a)(2), referred to the stated contract price for a ton of coal containing an acceptable amount of excess moisture. *Id.* at 41–42. The court concluded that Costain's approach yielded the implausible result that "the producer in the example given above sells 95 tons of coal for $20 per ton and 5 tons of excess moisture for $20 per ton and thus, coal and water are equal in value to the purchaser." *Costain*, 36 Fed. Cl. at 42. While excess moisture may be present in

---

**5.** Pyro Mining requested a refund of $388,-548.07, while Pyro Alcoa sought a refund of $27,340.82.

coal, stated the court, customers pay only for the coal and not for the excess moisture. *Id.* In that regard, the court noted a passage from *A.J. Taft Coal, Inc. v. Connors,* 906 F.2d 539 (11th Cir.1990) (*Taft II*), where the Eleventh Circuit stated:

> " Coal" means "coal" and it is not an ambiguous term.... [The producer] was never paid for excess water contained in the coal it sold to its customer, Alabama Power, because Alabama Power paid only for the coal it purchased, reducing the price it paid to account for the water. Consequently, Alabama Power did not purchase a "coal product" consisting of coal and excess moisture; it purchased coal alone. [The producer] threw in the water for free.

*Costain,* 36 Fed. Cl. at 42 (quoting *Taft II,* 906 F.2d at 544). The Court of Federal Claims further noted that, in the case before it, there was no evidence that a different approach was followed. *Costain,* 36 Fed. Cl. at 42. The court stated:

> In sum, all of [Costain's] arguments suffer from the same defect—each is based on the erroneous premise that a portion of the sales price of coal can be allocated to the excess moisture present in the coal. This premise is contrary to case law and industry practice, and is inconsistent with the established definition of "coal" for purposes of section 4121. Finally, [Costain's] method is unreasonable because it disregards the presence of excess water when computing the amount paid for each ton of taxable coal, but then considers it when determining the total number of tons of taxable coal sold.

*Id.* at 43 (footnote omitted).

Accordingly, the court granted the government's motion for summary judgment, denying Costain the refund it sought. Costain requested reconsideration, which the court denied. This appeal followed.

## DISCUSSION

■ Pursuant to Rule 56 of the Court of Federal Claims, summary judgment is properly granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56. We review the grant of summary judgment by the Court of Federal Claims *de*

*novo. Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1107 (Fed.Cir.1992). In this case, there are no material facts in dispute. The sole issue before us is one of law, *i.e.,* whether the court erred in sustaining the IRS method of determining the price at which Pyro Mining and Pyro Alcoa sold their coal, for purposes of calculating the section 4121(a)(2) excise tax. We review the Court of Federal Claims' decision on a question of law, such as statutory interpretation, *de novo. Weddel v. Secretary of Health and Human Servs.,* 100 F.3d 929, 931 (Fed.Cir.1996); *see Hodges v. Secretary of Dep't. of Health and Human Servs.,* 9 F.3d 958, 960 (Fed.Cir.1993) (stating that "questions of law such as statutory interpretation ... are subject to complete and independent review").

■ On appeal, Costain agrees with the holding of *Taft I,* as do we, that the term "coal," as used in section 4121, does not include excess moisture which can be reasonably measured. *See Taft I,* 605 F.Supp. at 372. Costain argues, however, that the Court of Federal Claims erroneously took *Taft I* one step further by substituting an "effective" price of the coal in place of the actual contract price. Costain contends that the literal wording of the statutory language "price at which such ton of coal is sold by the producer" refers simply to the stated contract price, which in the parties' hypothetical is $20 per ton. In addition, Costain submits that the Court of Federal Claims erred by analyzing the economics of the arrangement, and by in fact redefining the economics, upon which it concluded that purchasers did not pay for excess moisture. Costain maintains that the court only had to decide an issue of statutory interpretation, for which it had no reason to take into account the negative value in the purchase price associated with excess moisture.

Costain's arguments are without merit. No one disputes that the term "coal," as used in section 4121, refers to coal that does not contain any excess moisture which is reasonably measurable. *See Taft I,* 605 F.Supp. at 372. Furthermore, a strong presumption exists "that a given term is used to mean the same thing throughout a statute, ... a pre-

sumption surely at its most vigorous when a term is repeated within a given sentence." *Brown v. Gardner,* 513 U.S. 115, 118, 115 S.Ct. 552, 555, 130 L.Ed.2d 462 (1994). Therefore, "coal" under section 4121(a)(2) means coal which does not contain any excess moisture that is reasonably measurable, and the phrase "such ton of coal" refers to a ton of coal that contains no such excess moisture.

Based upon this interpretation of the term "coal," we conclude that the statutory language "price at which such ton of coal is sold by the producer" plainly refers to the price for a ton of coal that does not contain any excess moisture. In so doing, we accord the statute its plain and unambiguous meaning. *See Hanover Bank v. Commissioner of Internal Revenue,* 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L.Ed.2d 187 (1962) (stating that " 'the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses' " (quoting *Crane v. Commissioner,* 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301 (1947))).

In this case, the statutory meaning of the phrase "ton of coal" differs from the meaning accorded the same phrase in the contracts under which Pyro Mining and Pyro Alcoa sold its coal. Under those contracts, "ton of coal" referred to a ton of coal with impurities contained therein, including excess moisture. Therefore, in order to determine the price of "coal," as defined under the statute, one must determine exactly how much coal, without any excess moisture, was being sold by the companies and for how much.

Under the hypothetical posited by the parties, 100 tons of "product" were sold for $20 per ton, or a total of $2000. Of the 100 tons of product, 95 tons were coal and 5 tons were excess moisture. In allocating the contract price between the coal and excess moisture, we agree with the Court of Federal Claims that no part of the sales price should be allocated to the excess moisture. As stated in *Taft I,* "Water has no BTU value. Accordingly, although it is always expected to be present in some quantity with coal delivered, a producer operating pursuant to a BTU contract does not profit financially by shipping water with coal. Water added to coal increases the apparent tonnage, but decreases the number of BTU's per ton." *Taft I,* 605 F.Supp. at 369 (citations omitted).

Under the contracts in this case, if coal was delivered having moisture in excess of a specified amount, the purchaser could reject the delivery or reduce the sales price accordingly. This provision indicates that the parties to the contracts contemplated that purchasers should be relieved from paying the stated contract price if the coal contained an excessive amount of impurities, and therefore, less coal. Plainly, the parties did not contemplate that excess moisture had value.

*Taft II* supports this conclusion. In *Taft II,* a number of coal companies, including A.J. Taft Coal Company ("Taft"), were part of a collective bargaining agreement under which they contributed to a health and retirement fund based on the number of tons of coal they produced. *Taft II,* 906 F.2d at 540. The coal companies reduced the amount of their contributions based on the percentage of excess moisture contained in the coal produced. *Id.* at 541. Trustees of the fund found this approach to be contrary to the terms of the agreement and disallowed any further moisture deductions in making contributions to the fund. *Id.* Taft construed the trustees' actions as a unilateral change to the agreement and brought suit in federal district court to enjoin enforcement of such an interpretation. *Id.* The district court granted Taft's request, holding that the term "coal," as used in the agreement, did not include excess moisture. *Taft II,* 906 F.2d at 542. On appeal, the Eleventh Circuit affirmed. It held that the term "coal" meant coal without any excess moisture, and that the coal companies were justified in reducing their contributions according to the amount of excess moisture. *Id.* at 544. In so holding, the court stated:

> When ... a purchaser such as Alabama Power Company [to whom Taft sold all its output of coal] makes an adjustment in the price per ton of coal it purchases because the coal contains a measurable amount of excess water, the purchaser is buying the coal, not the water.... "Coal" means "coal" and it is not an ambiguous term.... [The producer] was never paid for excess water contained in the coal it sold to its customer, Alabama Power, because Alabama Power paid only for the coal it purchased, reducing the price it

paid to account for the water. Consequently, Alabama Power did not purchase a "coal product" consisting of coal and excess moisture; it purchased coal alone. [The producer] threw in the water for free.

*Id. Taft II* establishes that in purchasing coal, the coal has value, while the excess moisture does not.

Applying these principles to the posited hypothetical, for the contract price of $2000, the producer sold 95 tons of "coal," as that term is defined in the statute. Therefore, the "price at which such ton of coal [was] sold by the producer" under section 4121(a)(2), was $2000/95 tons, or $21.05 per ton.[6] Thus, the IRS's calculations of the amount of excise taxes due from Pyro Mining and Pyro Alcoa were correct.

## CONCLUSION

The phrase "price at which such ton of coal is sold by the producer" in section 4121(a)(2) means the price of a ton of coal, where "coal" does not include any excess moisture. The IRS's method for calculating the excise taxes due from Pyro Mining and Pyro Alcoa under section 4121 comported with this definition. Accordingly, the judgment of the Court of Federal Claims is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

---

6. According to Costain's calculations, the 95 tons of coal are priced at $20 per ton, and the 5 tons of excess moisture are assigned a price of $20 per ton. Costain's error lies in assigning any value to the excess moisture. The entire stated contract price of $2000 must be allocated to the coal.