**AMAX COAL COMPANY,**
Plaintiff–Appellant,

v.

**UNITED STATES of America,**
Defendant–Appellee.

No. 97–1210.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1997.

Decided Oct. 30, 1997.

G. Daniel Kelley (argued), Edward P. Steegemann, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Plaintiff–Appellant.

Judith A. Stewart, Office of the United States Attorney, Indianapolis, In, Kenneth L. Greene, Joan I. Oppenheimer (argued), Department of Justice, Tax Division, Appellate

Section, Washington, DC, for Defendant–Appellee.

Before CUMMINGS, COFFEY, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

This case explores the depths of the Black Lung Excise Tax ("BLET"), Internal Revenue Code § 4121 (1986):

(a) **Tax imposed.**

(1) **In general.** There is hereby imposed on coal from mines located in the United States sold by the producer, a tax equal to the rate per ton determined under subsection (b).

(2) **Limitation on tax.** The amount of the tax imposed by paragraph (1) with respect to a ton of coal shall not exceed the applicable percentage (determined under subsection (b)) of the price at which such ton of coal is sold by the producer.

(b) **Determination of rates and limitation on tax.** For purposes of subsection (a)-

(1) the rate of tax on coal from underground mines shall be $1.10, ·

(2) the rate of tax on coal from surface mines shall be $.55, and

(3) the applicable percentage shall be 4.4 percent.

In other words, the BLET comes in two forms—a flat per ton tax *and* a limited ad valorem tax. At issue here is the second form of the tax, the limited BLET. Specifically, this case involves the application of the 4.4 percent tax to surface-mined coal from Wyoming and Indiana sold by the Amax Coal Company at a price below $12.50 per ton. The problem is that when coal producers sell "coal" at a per ton rate, they often define it as including things that one might not ordinarily think of as being pure coal. For instance, one of Amax's contracts allows "coal" to contain up to 35 percent excess moisture. Excess moisture (a.k.a. free, added, or surface moisture) is water on coal that comes from washing (a process used to separate

coal from sulfur and ash) and from natural condensation. Scientists distinguish excess moisture from inherent moisture in the natural coal seam. The dispute is over how to apply the 4.4 percent tax when a producer sells *coal and excess moisture* rather than *just coal.*

The courts and the IRS have resolved this issue regarding the flat per ton tax detailed in § 4121(a)(1). In *A.J. Taft Coal Co. v. United States*, 605 F.Supp. 366, 372 (N.D.Ala.1984), *aff'd. without opinion*, 760 F.2d 280 (11th Cir.1985), the court ruled that the flat rate per ton tax applies to the weight of coal and not to the weight of excess moisture sold along with the coal. This interpretation of the flat rate per ton tax generally favors coal producers by allowing them to avoid paying tax on a portion of the weight of any given shipment. Importantly, the IRS adopted this interpretation in Revenue Ruling 86–96 which states that, for purposes of § 4121, coal excludes excess moisture.

The problem arises with less expensive coal. Congress enacted the limited BLET in order to encourage the production and sale of low-priced coal. The 4.4 percent BLET does not apply simply per ton; instead it applies to the "price at which such ton of coal is sold by the producer." This language is the source of the controversy. Amax contends that it sells coal at a very low price. The IRS, on the other hand, doesn't think the price is really that low.

A hypothetical may help frame this conflict from the beginning:

A sells *B* 100 tons of "coal" from a surface mine at the low price of $1,000, or $10 per ton. Because of the low price, the limited 4.4 percent BLET applies. As permitted by the contract between *A* and *B*, the 100 tons of "coal" includes 5 tons of excess moisture.[1] Because of the *Taft* rule, the Service cannot tax the weight of the excess moisture. How, then, should the IRS levy the 4.4 percent tax?

The Apportionment Answer: The IRS should attribute a portion of the purchase price to moisture and a portion to coal.

---

1. If this coal sold for $20 per ton, *Taft* and Ruling 86–96 would dictate the outcome: the ·

IRS could tax 95 tons of coal at $.55 per ton.

Amax takes this position and contends that *B* pays $950 for *just coal* and $50 for excess moisture. The 4.4 percent tax should apply to the $950 price for *just coal*—a price of $9.50 per ton. Thus, *A* should pay a tax of $0.42 per ton of material shipped.

The Effective Price Answer: The IRS should assume that the purchasers really want only the coal. Under this theory, *B* pays $1,000 for 95 tons of *just coal*. In other words, *B* pays *A* more than $10 per ton of just coal. The IRS favors this option and argues that B pays an "effective price" of $10.52 per ton of *just coal* ($10 ÷ .95 = $10.52). The BLET should apply to this $10.52 amount. Thus, *A* should pay a tax of $0.46 per ton of *just coal*.[2]

Back to the facts: From January of 1989 through December of 1991 the IRS applied its interpretation of the BLET to all the coal produced by Amax's Belle Ayr and Eagle Butte mines in Wyoming and to a portion of the coal from Amax's Wabash mine in Indiana. Amax paid the assessed tax (approximately $1.3 million) but claims it was shafted by the IRS. Amax filed for a refund, which the IRS denied on April 11, 1994. Consequently, Amax brought this suit.

Amax sells the coal from these mines to a variety of public utilities in Kansas, Colorado, and Indiana under long-term coal supply agreements. These contracts differ, but they generally provide that Amax must furnish coal that meets certain specifications. These specifications determine what the industry calls the deadband. One of the specifications is the maximum excess moisture content. Amax faces no major problem complying with the excess moisture limits and is able to ship coal with an average excess moisture content of around 3 percent.

The contracts contain two price adjustment provisions. The first provision adjusts the price for coal that deviates from the deadband specifications. The second adjustment modifies the price based on the energy-producing power of the coal. This second adjustment focuses on the "calorific value" or

Btu (British thermal unit) content of the coal. Importantly, the moisture content of coal dramatically affects its Btu content because during combustion the evaporation of water soaks up heat. Thus, too much excess moisture could lead to either a deadband price adjustment or a calorific value price adjustment.

On the other hand, the utilities do not want totally dry coal either. Amax could employ thermal drying to reduce the excess moisture content, but this process could render the coal unsafe. Coal needs a certain small amount of moisture for safety. Moisture keeps down coal dust that otherwise could trigger spontaneous combustion. Coal also needs some moisture because the utilities calibrate their boilers to burn moist coal. Finally, the utilities' size requirements indirectly mean that the coal must have excess moisture. The utilities require coal in lumps of around 1 ½" to 2" in size in order for their pulverizers to make powder for the boilers. As a service, Amax crushes the coal down to this size. Because of the vast increase in surface area resulting from the crushing, the coal collects an enormous amount of condensation.

For all these reasons, Amax claims that excess moisture has actual value for its customers. According to this line of argument, the utilities purchase a "coal product" that contains coal and excess moisture—they need both. Because excess moisture has value, Amax contends, the IRS should equally apportion the per ton price to excess moisture and to coal. Amax believes that it should pay the BLET on only that portion of the price attributable to coal.

Before the trial, it appeared that Amax might prevail. On February, 2, 1996, the Southern District of Indiana, Judge Gene E. Brooks presiding, denied both parties' motions for summary judgment in *AMAX Coal Co. v. United States*, 932 F.Supp. 226 (S.D.Ind.), *vacated by* 959 F.Supp. 990 (S.D.Ind.1996); but later, on November 18, the court clarified that the ruling granted partial summary judgment. The court ac-

---

**2.** Looked at another way, *A* should pay a 4.4 percent tax on the $1,000 it received for 95 tons of coal. For each ton of material shipped, *B* would pay $0.44. Therefore, it may appear as if the IRS wants to tax *coal and excess moisture.*

cepted the *Taft* rule and stated that the meaning of "coal" does not vary depending on the price at which it is sold. The government had claimed that, because of the calorific value price adjustment, Amax really sold coal based on Btu value rather than weight. The *Taft* court had considered Btu contracts, and the IRS hoped to bring the case further under *Taft's* ambit. The court rejected the IRS's claim that Amax had entered into Btu contracts and ruled that Amax sold coal on a per ton basis. The court found a single issue of fact: whether the utilities deflated the price of the coal per ton due to moisture content.

At trial, the witnesses from the utilities uniformly testified that they paid only for coal and that they did not take moisture into account. They accepted the excess moisture as a necessary characteristic, but no one testified to buying excess moisture itself. When all the cards were played, Judge Brooks concluded that the IRS had properly interpreted and calculated the 4.4 percent BLET. *See Amax Coal Co. v. United States,* 959 F.Supp. 990 (S.D.Ind.1996).

Incidently, this case also dealt with other refund claims by Amax. On one of these claims, related to the § 4121 per ton BLET on higher priced coal, Amax prevailed. The court entered judgment in favor of Amax for $276,399.01—an amount that reflected Amax's payments of the assessed BLET principal, but not Amax's payments of interest. Furthermore, the court ordered the IRS to pay "interest first accruing from the date of the original assessment" rather than the date of the payment.

■ Now to our analysis: Even more than usual, this case is about semantics. The initial question is whether for purposes of the BLET "coal" means *just coal* or *coal and excess moisture.* Under case law interpreting the statute and under the IRS's regulations, "coal" means *just coal.* The problem is that in Amax's coal supply agreements "coal" means *coal and excess moisture.* The issue is whether Amax can define coal the way it wants to in its contracts and, as a consequence, lessen its tax liability. Phrased another way, should contractual language control or should statutory language control?

Framed in those terms, the answer seems obvious.

Amax claims that its customers pay for excess moisture. Amax has written its contracts so that "coal" includes excess moisture. In effect, Amax has defined "coal" so that it does not have to pay the full 4.4 percent tax on the per ton price it receives for its product. From a broad perspective, if Amax prevailed in this case, it would provide a ticket for any number of underground attempts by coal companies to use contractual language to redefine terms used in the tax code.

But perhaps we should not lay the blame at Amax's mine shaft. Perhaps the problem arose because of an irreconcilable conflict between the best definition of "coal" under the revenue laws and the practical necessities of the real world that require a different definition of coal. In any event, Amax's contracts contradict the *Taft* rule. Amax made no efforts to resolve these conflicts by clarifying the price per ton of coal without excess moisture. Admittedly, such a clarification simply might not make sense in the coal business. In addition, Amax may have negotiated the contracts before *Taft* became the rule. Nevertheless, Amax should not benefit from the resulting confusion.

The district court reached the same general conclusion by relying on *Costain Coal, Inc. v. United States,* 36 Fed. Cl. 38 (1996), *aff'd,* 126 F.3d 1437 (Fed.Cir.1997). At the time of the district court's decision, *Costain* was the only court to have decided the exact issue in this case—it accepted the IRS's effective price approach to calculating the 4.4 percent BLET. Judge Brooks found this case and *Costain* virtually identical on the facts. He concluded that Costain's contracts contained provisions for deadband price adjustments and caloric price adjustments similar to AMAX's contracts. Since Judge Brooks acted, the Federal Circuit has affirmed *Costain,* and one other district court has considered this question and agreed with the *Costain* court. *See Costain Coal, Inc. v. United States,* 126 F.3d 1437 (Fed.Cir.1997); *United States v. Cyprus Amax Minerals Co.,* 965 F.Supp. 287 (D.Conn.1997).

Under a contract that takes BTU value or caloric content into account, it makes no sense to allocate a portion of the purchase price to excess moisture because the price adjustment mechanisms lower the price based on the presence of too much excess moisture. The district court noted that if the utilities actually wished to purchase excess moisture alone, they would have included minimum excess moisture specifications, not just limits on excess moisture: "It would strain logic to assume that purchasers actually want excess moisture in their coal where contracts invariably set maximum levels of moisture but never minimum levels." *Amax*, 959 F.Supp. at 997. Similarly, the *Costain* trial court noted that, even if the utilities valued moisture, they certainly would not pay the same price per ton of moisture as they would for a ton of coal: "There is no evidence in this case supporting a finding that one ton of excess moisture is equal in value to one ton of 'coal.'" *Costain*, 36 Fed. Cl. at 43 n. 3. Judge Brooks and both *Costain* courts quoted *A.J. Taft Coal, Inc. v. Connors*, 906 F.2d 539, 544 (11th Cir.1990): "[The utility] did not purchase a 'coal product' consisting of coal and excess moisture; it purchased coal alone. [The producer] threw in the water for free." Based on this reasoning, the court below concluded that "moisture need not be deducted for taxation purposes because it was never included in the purchase price." *Amax*, 959 F.Supp. at 996. Therefore, the court rejected *Amax's* apportionment theory and adopted the IRS's effective price approach.

Judge Brooks explained his reasoning in the context of the statute as well. He concluded that *Taft* and Ruling 86–96 established a controlling interpretation of the BLET. He explained that the effective price approach appears superficially inconsistent with *Taft* because it seems to tax coal and moisture together. In reality, however, effective pricing simply corrects for the fact that *Amax's* coal contracts have dumped coal and moisture into the same hopper car.

Judge Brooks explained that it was necessary to establish a consistent meaning for coal under both forms of the BLET: Under the per ton tax, the IRS should tax tons of *just coal* only; under the ad valorem tax, the IRS should tax the price paid for *just coal*.

The term "coal" is famously underdefined by § 4121 and the applicable regulations, but it is important to note when reading § 4121(a)(2) the term "coal" is used more than once: "There is hereby imposed on **coal** . . . sold by the producer, a tax equal to the rate . . . per ton . . . [which] shall not exceed [4.4%] . . . of the price at which such ton of **coal** is sold by the producer." 26 U.S.C. § 4121(a)(2) (emphasis added). *Taft* defines the first "coal" to exclude moisture without reaching the next relevant usage. The *Costain* court was forced [to] reach beyond *Taft* and held that "coal" cannot cut both ways: "coal" as used throughout § 4121 excludes excess moisture, therefore, the 4.4% limitation must apply only to the effective price of coal sold, not the overall product price. To do otherwise would create a conflict within the statute and run contrary to well established rules of construction.

> . . . *Taft* remains intact for coal priced above the relevant thresholds, but where the § 4121(a)(2) limitation is utilized, taxes must be calculated by the "effective" or "actual" price of coal.

Id. at 997 (citations omitted).[3]

Similarly, the Federal Circuit explained that coal must have a consistent meaning throughout § 4121. *See Costain*, 126 F.3d at 1441. That court also based its reasoning on fundamental rules of statutory construction and concluded that "in order to determine the price of 'coal,' as defined under the statute, one must determine exactly how much coal, without any excess moisture, was being sold by the companies and for how much." *Id.*

The IRS points out that Treasury Regulation § 48.4216 (a)–1 supports the effective price theory. That regulation provides that,

---

**3.** In the final sentence of this quote, Judge Brooks indicates that the effective price theory somehow narrows *Taft*. That is not the case. While the *Taft* decision applies to the per ton tax, the judge recognized that we must apply the *Taft*

rule to both forms of the BLET and read "coal" consistently throughout § 4121. Rather than narrowing the effect of the *Taft* rule, this decision actually expands its scope.

for tax purposes, the price of an article includes the total consideration paid for any charge required by the manufacturer as a condition of the sale of the article. The IRS contends that this regulation encompasses the price attributed to impurities, such as excess moisture. While this regulation appears distinguishable on the grounds that it seems aimed more directly at advertising or selling expenses, it does seem to lend support by analogy at the least.

■ Amax responds with four arguments, none of which amount to much. First, it claims that its customers purchased the excess moisture as part of a "coal product." The court rejected this theory and explicitly found as a matter of fact that the utilities did not attribute a portion of the price to moisture. Second, Amax contends that the effective price theory defeats the congressional purpose of encouraging low-priced coal by raising the tax ceiling and taxing the weight of moisture. The court found that the effective price theory reflected congressional intent as revealed by the language of the statute. Third, Amax argues that the court improperly concluded that Amax employed Btu contracts. The court found as a matter of fact that Amax and Costain used similar contracts, but did not base its ruling on a determination that either *Taft* or the effective price theory applied only to Btu contracts. Whether we designate Amax's contracts as Btu contracts, or not, is a quibble- the effective price theory applies across the board. Finally, Amax believes that the lower court could not reverse its partial summary judgment without new evidence. On the contrary, a partial summary judgment amounts to no more than a revisable, interlocutory order.

We adopt the district court's reasoning regarding the statute and the application of the law to the facts. Obviously, "coal" should have the same meaning throughout the statute. The conflict arose not within the statute, but because of Amax's contracts. Those contracts tunneled under the statute and attempted to define "coal" as *coal and excess moisture. See Costain*, 126 F.2d at 1441 ("In this case, the statutory meaning of the phrase 'ton of coal' differs from the meaning

accorded ... in the contracts...."). Once Amax has sold *coal and excess moisture* for one price per ton, the only way to sort out the resultant slurry is to assess an artificial effective price for the coal absent the excess moisture. Thus, we affirm the district court's conclusion that, in order to apply the 4.4 percent BLET to coal and excess moisture sold for one price per ton, the IRS should employ the effective price approach.

The district court concluded as a matter of fact that Amax did not sell excess moisture separately from coal. This finding has the support of reason and evidence; Amax has not put forth any significant grounds upon which we could find it clearly erroneous. Nor does it really matter whether Amax sold coal under BTU or per toncontracts. The tax issue remains the same—to what price should the IRS apply the BLET. Therefore, it appears that the lower court properly interpreted the statute and properly applied the law to the facts.

Finally, with regard to the amount of the judgment, both the IRS and Amax explain that the district court erred in ordering a refund of overpaid taxes with interest running from the date of the assessment. Amax had paid an assessed tax liability of $1,343,192 and interest of $352,917.58. The court ordered a refund of $276,399.01 of overpaid principal but did not order the IRS to refund the corresponding interest. Amax deserves a refund of that part of the interest attributable to the overpayment, namely $72,622.58. In addition, the parties both explain that the court erred by ordering interest from the date of the assessment. The court should have ordered interest from the date of the overpayment, January 21, 1993, as required by I.R.C. § 6611(b)(1). Thus, we must REMAND with instructions that the court issue a new judgment ordering the government to pay Amax a refund of $349,021.59 with interest from January 21, 1993. In all other respects, the judgment of the district court is AFFIRMED. Each side shall bear its own costs.